FAULKNER *v.* PARISH MANUFACTURING CO.

1. TRIAL—EVIDENCE—PRESUMPTIONS—DIRECTED VERDICT.
   Upon defendant's motion to direct a verdict in its favor, the testimony most favorable to plaintiff's claim must be accepted.

2. NEGLIGENCE—TRIAL—PERSONAL INJURIES—EVIDENCE — CUSTOMS AND USAGES.
   In an action for personal injuries received by plaintiff, a

skilled mechanic, in falling into an unguarded pit in defendant's factory, while going to see a foreman, seeking employment, in view of the testimony of the foreman that he had been instructed by the manager to surround himself with skilled help, it could not be said that there was no evidence tending to establish a custom in defendant's plant of permitting the foreman to employ skilled labor for his department.

3. SAME—QUESTION OF FACT—EVIDENCE—INFERENCES.

Where the evidence as to whether the custom of allowing the foremen to employ the skilled labor was later abrogated by a new manager was contradictory, a question of fact was presented for the jury; they being the judges of the credibility of the witnesses and the legitimate inferences to be drawn from the testimony.

4. SAME—CONTRIBUTORY NEGLIGENCE—NEGLIGENCE.

It cannot be said, as a matter of law, that plaintiff was guilty of contributory negligence because he entered defendant's plant unattended at an early hour in the morning; a pitfall upon the first floor of a manufacturing plant not being a thing to be expected by an ordinarily prudent person.

5. APPEAL AND ERROR—NEW TRIAL—WEIGHT OF EVIDENCE.

That the Supreme Court might reach a different result on the facts than did the jury, is not sufficient justification for reversal on the ground that the verdict was against the weight of the evidence.

6. DAMAGES — PERSONAL INJURIES — EXCESSIVE VERDICT — PERMANENT INJURIES—EARNING CAPACITY.

Where plaintiff was 39 years old at the time of the accident, a skilled mechanic earning $25 a week, and at the time of the trial his pecuniary loss amounted to $2,100, a verdict of $9,800 was not excessive for fracture of the thigh bone, resulting in one leg being shorter than the other; he having spent five weeks in the hospital at one time and about eight months at another, suffering considerable pain; and the inference is strong that his earning power has been materially reduced.

Error to Wayne; Mandell, J. Submitted January 23, 1918. (Docket No. 169.) Decided March 28, 1918. Rehearing denied April 25, 1918.

Case by Edward S. Faulkner against the Parish

Manufacturing Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Goodenough & Long* (*Angell, Bodman & Turner*, of counsel), for appellant.

*Baubie & Baubie*, for appellee.

Fellows, J. Plaintiff is by trade a machinist, a toolmaker; defendant a manufacturing corporation employing several hundred men; it had foremen in the different departments of its plant; among them was a Mr. Hovey who was foreman over unskilled labor, also a Mr. Kadow, foreman of toolmakers. A large room, where considerable in number of the employees worked, was called the "pressroom." A part of this room was occupied by toolmakers and the part so occupied was called the "toolroom," although not partitioned off. The entrance to the pressroom is a large sliding door in which is cut a smaller one. Defendant has a "No Admittance" sign at this entrance. The room leading to this entrance has the time clock; it is called the "checkroom," and is sometimes spoken of as the "clockroom." On the right as one enters the checkroom, is a room occupied by the employment manager and timekeeper. It is not established that there is a sign or other indication of the use of this room upon its entrance, but at the entrance of the premises, and before the building is reached is a "watchman's house." Its occupant, defendant claims, directs persons seeking employment to the proper room.

At the time of the accident Mr. Hovey was living at the same place plaintiff was, but they do not seem to have been acquainted. The landlady, knowing plaintiff was temporarily out of employment, spoke to Mr. Hovey about getting a job for him with defendant. He in turn spoke to Mr. Kadow, and Mr. Kadow told

him to have plaintiff come to defendant's plant. Pursuant to this he left word with the landlady to have plaintiff come to the toolroom. On the morning of February 24, 1916, the exact time being in dispute, having received this word from his landlady, plaintiff went to defendant's plant. The watchman testifies that he directed plaintiff to wait in the checkroom. Plaintiff denies this. In answer to special questions the jury found with plaintiff on this subject. It is the claim of the plaintiff that while he remained in the checkroom some employees came in, opened and blocked the small door in the entrance to the pressroom; that he did not see the "No Admittance" sign; that he inquired of a laborer where the toolroom was, and was directed to a place in the pressroom where a light was burning; that it was early in the morning; the pressroom was dark, with no other light than the distant one burning. He fell into a pit a short distance from the entrance to the pressroom, which he claims had been left unguarded, and which had been excavated for the purpose of installing a heavy press. Plaintiff received serious injuries from this fall and was confined in the hospital for several months.

Defendant insists, and its proof tended to show, that employees were not hired direct by the foreman; that it had an employment manager in a room provided for that purpose, where all employees were engaged; that its superintendent had, shortly before the accident, sent a written notice to all foremen directing that prospective employees be required to come to the office; that skilled employees were sent with someone to direct them to the foreman to try them out before being finally employed; that, while occasionally this rule was infringed, it was not of such frequent occurrence as to create a custom; that plaintiff was not on the premises under such circumstances as made him its invitee, and that it, therefore, owed him no duty to

guard the pit or see that it was properly lighted. · Defendant, however, insists that it had caused the pit to be guarded, and that the pressroom at the time of the accident was properly lighted.

The plaintiff does not claim that defendant owed him the duty of guarding or lighting the pit, unless he was lawfully on the premises by invitation of defendant, either express or implied. · He does not deny the right of the defendant to make such a rule as it may desire requiring persons seeking employment to go to the office of the employment manager instead of the foreman. He does deny that such rule was made, or at least denies that it was promulgated to the foreman of toolmakers, and insists that the plan of having skilled employees, at least toolmakers, go direct to the foreman to be first tried out before going to the employment office had been so long and so universally adhered to and acquiesced in by defendant as to amount to a custom.

At the close of plaintiff's proofs, and again at the close of the case, defendant asked for a directed verdict. The refusal of the court to grant those motions presents the principal question in the case. The main contention of defendant is that a custom has not been established. If we consider defendant's testimony alone, this is undoubtedly true, but upon defendant's motion to direct a verdict the testimony most favorable to plaintiff's claim must be accepted. The plaintiff produced as witnesses all the men who had been foremen of the toolroom covering a period of over a year and a half preceding the date of the accident. These witnesses were Fred A. Fuestel, Harold F. Skiff, and Charles K. Kadow. Mr. Feustel was in defendant's employ in the toolroom for two different periods, one of ten and the other of four months. He testifies:

"The fact of the matter is in my time with the Parish Manufacturing Company, my first time with

the concern was that any man in executive capacity employed his own help, provided he knew of suitable persons who could fill the vacancy which he might have open, he might have a friend or an acquaintance or another executive man in the institution who knew of such a man who could fill the vacancy for him, and he might come along and suggest him. If such a man suggested it and he informed this man to bring his friend, to bring a man to the institution or send him with a slip of paper, or maybe nothing, to come in and see the man in charge preparatory to starting to work. * * * The employment bureau never hired a man for me in the entire time I worked for the Parish Manufacturing Co. I had about 18 men under me when I started there and I used the larger class men. I covered it with ten men and would fill the vacancies whenever the occasion presented itself. I had hired men that way. * * * When a man worked for me three or four hours, 99 cases out of 100 if he filled the bill he never saw the employment man. I took his name and address, whether married or single, his age, etc., and what I knew the company required and took that in on a slip of paper myself or sent it in with the errand boy, that is all they got. After that he got his pay at the office, I would not hand it to him."

Mr. Skiff succeeded Mr. Fuestel. He originally commenced work there under Mr. Fuestel and was hired direct by him. He testified as follows:

"The men would come in and ask the foreman for a position, and he would ask the man and see what he could do and what his ability was, and he would tell him to go in and go to work, if he wanted him, and if he did not want him he did not give him a job.

"Q. How did he get in there?

"A. Sometimes the watchman at the gate would tell him to go in, and if the watchman was not there he would walk in, and if the man was recommended to you, he would come out there, and if anyone stopped him he would tell the watchman, and he would come on in and he was generally told where the tool room was. I was employed there on three different occa-

sions. I hired men in that way, and was hired myself there."

Mr. Kadow was the foreman at the time of the accident, as we have already stated. He was originally hired to work in the toolroom by Mr. Skiff through the recommendation of a friend of his to Skiff. He testified:

"Through this friend of mine, he came up to see me and told me that they needed a man and I was not working at the time and I went over there and got a job. I walked right through there to the toolroom and saw a man named Skiff, and also this man that told me to come there. They told me to come in on Monday. They told me to come Saturday, but I did not want to come in on Saturday for a half a day, and I went Monday. I went to work then. It must have been two or three hours after I went to work before I went to the office. Afterwards I was foreman of the die and tool department. I had had requirements there for skilled labor during my time. * * * Mr. Eckert was superintendent at the time I went there as foreman of the tool department. I did not receive any instructions from him with regard to employment of skilled labor. I got instructions from Mr. Burkhardt, the manager of the Parish Manufacturing Company. They went to the effect that I was to surround myself with the most capable men that I could get, that I was now to take charge of the tool room and surround myself with the most capable help that I could get. I procured skilled labor under those instructions at different times. Any one that knew of a man in our line of work, if he came to me and said, can you use another man, and I would say yes, and any one that he knew of he brought back in, or any one that worked there that knew about them. It must have been 25 men that I employed there in that way."

On cross-examination he testified:

"The clockroom and employment office was erected along in October or November, 1915. It is a building about 18 feet square. The main building of the com-

pany is of brick.  After that building was erected it was customary for men seeking employment to stand in the clockroom or in the employment office.  That was before they got into the pressroom.

"*Q.* So that conditions were different at the time you were empoyed there and later?

"*A.* Not as far as the men got to our department, it was not any different at all.  I remember distinctly of half a dozen men who were hired through the employment office that were in my department the next morning previous to my getting there.  Those men were employed in the employment office after I talked with them before reporting to the employment office.  I would tell them to report the next day."

We are impressed that with this testimony in the case the court could not say that there was no evidence tending to establish a custom in this plant of permitting the foreman of the toolroom to employ the skilled labor for his department.  But it is said, and much was made of it upon the argument, that in January preceding the accident Mr. Peppel became superintendent of the factory and that a few days thereafter he gave written instructions to the foremen and posted them up in the factory, that all workmen must be employed by the employment manager.  Some of the foremen corroborate this but none of them are able to produce such written instructions, nor was Mr. Peppel able to produce the copy from his files, or the one posted in the factory.  Mr. Kadow was not asked by either party the direct question whether he received such instructions, so far as we are able to ascertain from the record, some of his testimony being in narrative form; but we are impressed that his testimony is reasonably susceptible of the construction that the only instructions received by him came from Mr. Burkhardt, and that there was no change ordered with reference to the men seeking employment going to his department direct, as he says: "It was not any different at all."  In addition to the testimony of these foremen, with reference to the particular department in which

plaintiff was seeking employment, there is in the record the testimony of Mr. Hovey, who, as we have stated, was the labor foreman. He sustained the claim of plaintiff that skilled workmen were employed direct by the foreman. He says:

"*Q.* What instructions did you have, if any, with regard to employing skilled workmen, or mechanics from the outside?
"*A.* The help I employed I employed direct; if I needed a man I hired him and put him to work."

He further says that he did not employ the mechanics himself but would take them to the foreman who would hire them. He further testified:

"*Q.* You had already done the same thing in regard to mechanics with other foremen there before this?
"*A.* Taken men in there—yes.
"*Q.* Had you been informed by any one in authority there forbidding you to do that?
"*A.* No, sir.
"*Q.* During the time you were there?
"*A.* No, sir."

The jurors were the judges of the credibility of the witnesses and the legitimate inferences to be drawn from the testimony, and in view of all the testimony of Mr. Kadow and Mr. Hovey we cannot accept the contention of defendant that the testimony shows without dispute that this rule of the superintendent was promulgated in this department, or that Mr. Kadow's orders, that he was to take charge of the toolroom and surround himself with the most capable men he could get, received direct from the manager, the head of the plant, were abrogated.

Nor are we able to say, as matter of law, that plaintiff was guilty of contributory negligence. Defendant claims that it was negligent for plaintiff to go into the pressroom unattended at so early an hour as defendant claims he did. But the time of plaintiff's arrival at the plant and of his injury were matters of

dispute. The witnesses differing some 30 minutes in their testimony. It was for the jury to determine who was correct. While some of defendant's testimony was quite persuasive its credibility was for the jury. Neither plaintiff nor any prudent person could be expected, as matter of law, to anticipate a pitfall upon the first floor of a manufacturing plant; it was not a thing to be expected. It was occasioned by preparing a foundation for a heavy press and was something out of the ordinary. Plaintiff was directed to the place where the light was burning, and while going towards it, and looking ahead, he fell into an unguarded pit. The court committed no error in refusing to direct a verdict on the grounds asked.

The trial court, upon the motion for a new trial, found that the verdict was not against the weight of evidence, and this is assigned as error. It is not a sufficient justification for reversal on this ground that this court might reach a different result on the facts than did the jury. There must be something more. While some of defendant's testimony would be quite persuasive if this court was the trier of the facts, we are not impressed that it so greatly preponderates as to justify us in disturbing the finding of the trial judge, who heard and saw the witnesses. We gather from this record that the trial judge felt that the case was a close one on the law and so expressed himself, but we find no such expression or intimation on the facts.

Nor are we persuaded that the verdict is grossly excessive. The amount awarded plaintiff was $9,800. At the time of the accident plaintiff was 39 years old, was a skilled mechanic earning $25 a week. It is admitted that his pecuniary loss to the time of the trial amounted to $2,100. The concrete foundation had been put in the pit where plaintiff fell. He fractured the thigh bone. Infection set in, and a steel plate and

wire were first put in, but gave way, due to softening of the bone which became practically rotted. Several months later he was inclosed in a plaster dressing. He was in the hospital on the first occasion for five weeks, and was then home seven weeks, when he was obliged to return to the hospital, where he remained about eight months. The record fairly discloses that during all this time he had a constant discharge of pus and suffered considerably. The injured leg is two inches shorter than the other one, and the inference is very strong that his earning power has been materially reduced.

We have examined the other errors assigned, and find no reversible error. The charge was an able one, and fully protected the rights of the defendant.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, and STONE, JJ., concurred. KUHN, J., did not sit.