# Andrew C. Paulsen, Appellee, v. McAvoy Brewing Company, Appellant.

## Gen. No. 25,525.

1. TRIAL, § 132*—*when argument of counsel is error.*   Where the questions whether defendant was guilty of negligence or the plaintiff guilty of contributory negligence, or whether both were negligent, were close and required on the part of the jury a careful consideration of all the testimony, and counsel for the plaintiff indulged repeatedly in utterances which were extreme and beyond the limits of fair argument and tended to arouse the prejudice and passions of the jury, such conduct, even though the court sustained objections to it, was sufficient reason for reversal of the judgment in plaintiff's favor.

2. TRIAL, § 132*—*what statements of counsel in argument are erroneous.*   Statements of plaintiff's counsel in his closing argument severely castigating defendant's counsel whose conduct had been wholly proper, asking that defendant be punished for employing such an attorney and charging that in the absence of a defense, defendant's counsel had sought to cast aspersion upon the plaintiff, *held* prejudicial.

3. TRIAL, § 130*—*what is proper argument of counsel.*   An attorney in his argument has the right to challenge the credibility of the plaintiff.

4. DAMAGES, § 124*—*when verdict is not excessive.*   A verdict of $5,000, where plaintiff sustained a compound fracture of the tibia and fibula which prevented him from returning to work for 11 months and thereafter from following his former occupation, was not excessive.

Appeal from the Circuit Court of Cook county; the Hon. GEORGE A. SENTEL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Reversed and remanded. Opinion filed December 22, 1920.

**Statement by the Court.**   The plaintiff having recovered a judgment for $5,000 and costs in the circuit court of Cook county against the defendant, for personal injuries alleged to have been sustained by him on August 27, 1917, when a collision took place be-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.
    Vol. CCXX 18

tween him and one of the defendant's beer wagons drawn by a team of mules at or near the north crosswalk of the intersection of Randolph street and Wabash avenue in the City of Chicago, this appeal was taken by the defendant to reverse that judgment.

The plaintiff's declaration filed on September 5, 1918, and which consists of a single count, alleges, among other things, that the defendant through its agents and servants so carelessly and negligently operated, managed, drove and maintained a certain wagon or truck and team, in a northerly direction on Wabash avenue, that it collided with the plaintiff, knocking him down and injuring him. The defendant filed a plea of the general issue.

Wabash avenue in the City of Chicago runs north and south and intersects Randolph street at right angles. There are two sets of street car tracks, known as the northbound and southbound tracks, in Wabash avenue. Wabash avenue from curb to curb is about 50 feet wide and Randolph street from curb to curb, about 47 feet wide. About 2 feet north of the north line of the intersection of these two streets and about 3½ feet east of the east rail of the northbound track is a steel pillar about 18 by 24 inches, embedded at its base in concrete and then rising to the elevated structure which it helps to support.

The plaintiff, Andrew Paulsen, at the time of his injury was a man 56 years of age, a tile setter, employed by the Interior Tile Company. A few minutes after 7:00 a. m., August 27, 1917, the plaintiff got off a street car at State and Randolph streets and walked east on the north side of Randolph street, intending to go to the Randolph street station of the Illinois Central Railroad, which is about 2 blocks east of Wabash avenue. His hearing and eyesight were both good and it was a bright day so that everything around could be easily seen. When the plaintiff reached the northwest corner of Wabash avenue and Randolph

street, he was in such a position that he could look south and north in Wabash avenue. Walking east on the north side of Randolph street, he undertook to cross Wabash avenue at the intersection. His testimony is as follows: "When I was stepping off the sidewalk to cross Wabash avenue, I looked to see if there was a car. I didn't see none, and I go about,— I walk when I come over to the northbound track I looked south, and I saw a wagon coming. It was coming north in the northbound track, between 30 and 40 feet south of me, and after I had crossed the track I heard a woman scream on the sidewalk, and I looked up, that is about all I remember, and I was struck at the same time."

On cross-examination he said that he always looked both ways and that on this occasion when he got over to the northbound track he looked south; that he did not remember whether he looked south before he reached the northbound car track; that he did not remember whether he looked south until he had gotten into the northbound car tracks; that he did not see any mules coming from the south when he looked south; that the team of horses and wagon were the only things he saw coming. The evidence shows that after the plaintiff had passed the northbound car track a few steps he was struck by the mule team or the shaft of the wagon drawn by the mule team and was knocked down and run over.

The distance from the northbound street car track to the point where the plaintiff was struck was somewhere between 6 and 8 feet. There is some conflict in the testimony as to whether the collision took place on the north crosswalk at Randolph street or a few feet north.

On the morning in question the mule team with the brewery wagon belonging to the defendant was driven north on Wabash avenue. With its load of bottled beer it weighed nearly three tons. The driver of the

mule team testified that as he approached Randolph street going north the mules were going at a slow trot; that they collided with the plaintiff a little north of the north crossing on the east side of Wabash avenue between the pillar and the sidewalk; that he noticed the plaintiff pass out in front of the pillar when he was about 8 feet from him; that he started to whistle to the plaintiff but he paid no attention; that the team then reached him and he was struck with the pole or with the collar; that that frightened the mules and they began prancing and went on about 7 or 8 feet; that there was a garbage wagon alongside of the pillar; that he did not see the man coming out until he stepped out from behind the pillar; that the man was walking in a northeasterly direction and looking up at the elevated; that he, the driver, whistled and pulled in his lines and called "Hey"; that he had a full tight line and tight rein all the time; that at no time while the mules were approaching Randolph and Wabash were they galloping; that the right front wheel ran over the plaintiff. On cross-examination he said that there was a garbage wagon in the car track and that when the plaintiff was struck the heads of the mules were about opposite the center of the garbage wagon; that Wabash avenue was clear with the exception of the garbage wagon and his own vehicle; that there was no street car in the neighborhood.

Six occurrence witnesses were called and testified for the plaintiff: Benson, an accountant, Forsberg, a salesman, Mr. and Mrs. Magnuson and Florence Peterson, all of whom were standing together at the time at the northeast corner of Wabash and Randolph street and Whitfield, a sales manager, who at the time of that accident had started to go west from the southeast corner of Randolph and Wabash. Benson stated that when he first saw the mules which were drawing the defendant's brewery wagon they were near the

north curb and he saw the plaintiff coming across
the street; that he was struck between the street car
track and the sidewalk a little north of the north line
of the intersection. On cross-examination he stated
that just before the accident he heard the driver
holler "Hey"; that he did not see a garbage wagon
there but that there was a wagon or a car, he did not
know which, coming from the south on Wabash ave-
nue. Forsberg stated that he saw the brewery wagon
coming on the east side of Wabash avenue in the
center of Randolph street; that it was going very fast;
that he saw the plaintiff crossing the street going
east; that he saw the wagon or the pole of the wagon
strike the plaintiff; that the plaintiff "sort of grabbed
on to the shaft of the wagon which dragged him along.
The shaft or mules rather were going from one side
to another and * * * throwed Mr. Paulsen under-
neath the mule on the right-hand side." That the
plaintiff was knocked underneath the mule and the
mule stepped on him and the front wheel on the right-
hand side went over his leg. Forsberg puts the place
of the collision about 4 or 5 feet west of the east curb
of Wabash avenue and about 8 or 10 feet north of
the north curb of Randolph street. On cross-exam-
ination he stated that just before the accident he did
not see any street car nor any garbage wagon; that
he only saw the McAvoy brewing wagon with two
black mules; that when he first saw them in the mid-
dle of Randolph street on the east side of Wabash
avenue coming north they were galloping and the
wagon was making considerable noise and the driver
was pulling on the lines and trying to stop them;
that he did not remember whether he heard the driver
holler "Hey" just before the accident; that the plain-
tiff did not stop from the first time he saw him. Mrs.
Magnuson stated that she heard the clatter of hoofs
and just happened to turn around and saw the shaft
strike the plaintiff; that she screamed and turned

away; that she saw the occurrence just as the plaintiff was struck; that the plaintiff was then between the car track and the curb. On cross-examination she stated that the brewery wagon was not in the street car track; that she did not hear the driver shout; that she saw the driver pulling on the mules just, before the accident. Her husband stated that he saw the team of mules come north at quite a speed; that they turned out from the center of the street and came along close to the curb; that they left the street car tracks near the southeast corner; that they were trotting, galloping, "kind of jumping from one side to another"; going fast; that the plaintiff was between the car track and the sidewalk, a little nearer the former than the latter when he was struck; that he tried to grab hold of the shaft but fell to the ground; , that the mules were bucking and jumping from one side to the other; that he saw one mule step on him and saw the right front wheel of the wagon run over his left leg; that he saw the driver jerking on the lines as soon as the mules got out of the car track. On cross-examination he stated that he saw no street car and that no other wagon was going north except the one drawn by the mules; that he did not hear the driver shout; that the driver was seesawing the mules practically all the time after starting to cross Randolph street. In describing what he meant by galloping or prancing, he stated, "I meant that they were dancing from one side to another very much as a team— I don't know whether they were scared or what was the matter, or from jerking the lines."

The witness Florence Peterson stated that she did not see a team coming; that she saw the plaintiff crossing between the last structure and the curb and heard a very loud noise of horses feet; that the next thing she saw the pole struck the plaintiff. On cross-examination she testified that she first saw him between the street car tracks and that she did not see

any other wagon but the brewery wagon. Whitfield stated that when he was about even with the first pillar of the elevated at the southeast corner he started to go west and noticed a gathering of people and then saw the wagon with a span of mules approaching him at a gallop; that when he first saw them they were at the southeast corner of the intersection about 15 feet south of where he was; that he ran diagonally across the street and stopped about 6 feet from the curb; that he heard some one scream and turned around and saw the plaintiff underneath the wagon about 25 feet north of Randolph street. On cross-examination he stated that when he got about 6 feet from the corner of the intersection the team of mules was galloping north; that when he first saw them they were south of him; that he ran in front of them.

On behalf of the defendant, Burnham, an employee of the Chicago Hat Company, Horving, the driver of a garbage wagon, and Muck, a surgical instrument maker, testified. Burnham stated that he got off a southbound street car at the northwest corner of Randolph and Wabash avenue and started east across Wabash on the north side of Randolph; that he saw a team coming north; that when he arrived at the elevated pillar he stopped; that a wagon and team of mules went by him when he was standing just north of the elevated pillar; that they were between the pillar and the curb; that after they passed him he saw them strike the plaintiff and knock him towards the curb; that when they struck him they were about 3 or 4 feet north of where he was standing; that he had not seen the man before that time; that as the team of mules passed him they were walking; that the driver was trying to keep the mules from the curb, pulling them towards the car track; that he heard no one shout before the accident. On cross-examination he testified that the driver just before the mules

struck the plaintiff was trying to get his team out from the curb and was pulling them away from the curbstone; that he, the witness, stood about 3 feet north of the pillar; that the plaintiff when struck was north of him and about 3 feet east of him. Horving stated that on the morning in question he was hauling cinders and drove an empty garbage wagon drawn by two horses north on Wabash avenue in the northbound car track; that when they crossed Randolph street they were walking; that he did not see any southbound street car come on the other track; that he saw a man in front of him walking across the street about 10 feet in front of his horses; that he was not on the crosswalk but about 20 feet north of the Randolph street crosswalk; that he drove in the street car track and did not see anything behind him in the track; that there was a beer wagon drawn by two mules alongside of him but back about 20 feet; that the mule team was going north on the east side of the street between the car tracks and the east curb and were trotting; that when the man crossed 10 feet in front of him the beer wagon and mules were about 20 feet behind him going north; that they were going at about a normal trot; that when the man crossed in front of him he heard the driver of the beer wagon shout and whistle; that he did not see the man look to the south at any time; that he looked east and looked the way he walked; that the driver of the mules was holding the lines as tight as he could hold them and he was seesawing them; that he pulled the left side line so that he would avoid the man, that is pulled the mules to the west; that the next thing he saw the plaintiff was struck with the pole and knocked down; that after he was struck he grabbed at the mule and the mule got scared and got wild. On cross-examination he testified that he first saw the beer wagon when he was just over the north crosswalk; that he did not see it until he got completely across Randolph street;

that when he first saw the plaintiff he was about 20 feet north of the north curb of Randolph street and was walking straight east; that he did not notice him until he was in front of his horses on the northbound track; that when the driver of the beer wagon whistled his mules were about even with his seat and at that time the mules were trotting; that he stopped as soon as possible after he saw the plaintiff; that when he started to whistle he was not more than 5 or 6 feet from the plaintiff, the mules of the brewery wagon being then just about even with his, the witness', seat.

Muck stated that on the morning in question just before the accident he started to cross Wabash avenue and Randolph street from the northwest corner; that when he had just gotten across the street he heard some people shouting and when he turned around he saw the plaintiff hit by the pole of the brewery wagon and fall under the mule on the right-hand side; that at the time he was struck he was north of the crosswalk.   On cross-examination he testified that when the plaintiff was struck he was a little north and west of him; that he was crossing on the same crosswalk as the witness; that at the time he was struck the mules were between the car track and the curb going directly north, the wagon and the mules being in a straight line; that he, himself, saw the mules coming when they were about in the center of Randolph and Wabash avenue and at that time he was about the center of the space between the car tracks.

As to the plaintiff's injuries, the evidence showed the following:   The plaintiff received a compound fracture of the tibia and fibula of the left leg about 3 inches above the ankle.   He was taken to St. Luke's hospital where he remained for 5 weeks.   He was operated on and a Parom band was placed around the bones of the injured leg.   After leaving St. Luke's hospital he went home for 3 weeks and later was re-

moved to the Norwegian hospital where he was for 3 weeks and the Parom band was removed and a Lane plate substituted. Prior to the injury the plaintiff received wages at the rate of $6 per day. He did not work until about 11 months after the injury. He then set tile for about 3 weeks but had to stop on account of his leg hurting him. He found that he was unable to do tile setting, the work he had been accustomed to do, and he went to work in an automobile truck factory operating a milling machine, which work he could do while sitting down. That work he did for about 7 months and he was then compelled to stop on account of the condition of his leg. At the time of trial it still had a running sore.

At the close of the evidence eight instructions were given for the plaintiff and twenty instructions for the defendant. The jury brought in a verdict for the plaintiff in the sum of $5,000, and judgment was entered thereon. This appeal is from that judgment.

WINSTON, STRAWN & SHAW, for appellant; CHARLES J. McFADDEN, HAROLD BEACOM and RODNEY C. GLOVER, of counsel.

WILKERSON, CASSELS, POTTER & GILBERT, for appellee; RALPH F. POTTER and KENNETH B. HAWKINS, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

It will be observed from the statement of the evidence that the questions whether the defendant was guilty of negligence or the plaintiff was guilty of contributory negligence, or whether both were negligent, were somewhat difficult to answer and required, on the part of the jury, a careful consideration of all the testimony of the various witnesses and a proper

appreciation of the law applicable thereto as set forth in the instructions given by the court, and in order that that might be accomplished and justice done to both parties, it especially behooved counsel for both sides to conduct the trial with a due regard to proper practice and a recognition of the importance of endeavoring according to the well-recognized rules of procedure to elicit the truth and present it to the jury fairly and without sinister reflections and innuendoes. The determination of the rights of the parties in such a case is a matter of very serious import to all concerned, and where the questions to be answered by the jury are difficult as in the instant case, it is especially essential that no ulterior influences such as may arise from inflammatory utterances of counsel shall be used and endanger an unprejudiced verdict of the jury.

When counsel for the plaintiff was making his closing argument to the jury, the following colloquy took place:

"It is a cardinal principle with a certain class of attorneys, that when they have no case they must abuse the plaintiff's witnesses and his lawyer. Now, counsel has followed that out implicitly in this case. He has no case. There is no defense to this action. He knows it; I know it; you know it. So he conceived that it is his duty, in the interests of this brewery company, to come in here and compel this poor man Paulsen to sit here in the front seat—

"Mr. McFadden: Just a minute.

"Mr. Potter (continuing):—and endure—

"Mr. McFadden: I wish to object to the remarks of counsel, in referring to this defendant as 'this brewery company' and 'this poor plaintiff sitting here on this seat.'

"The Court: Don't make any inflammatory remarks to the jury.

"Mr. Potter: I am making none.

"Mr. McFadden: Just a minute. I wish, if the court please—

"Mr. Potter: I want this taken out of my time.

"Mr. McFadden: Yes, I wish, if the court please, to preserve an exception to the remarks and conduct of counsel before the jury.

"The Court: The exception will be allowed. Go ahead.

"Mr. Potter (continuing): It is a brewing company, isn't it? I say that the conduct of counsel representing this brewing company, in compelling this plaintiff to sit here on this front seat and listen to him, in his defenseless position, call him a liar and a perjurer, is shameful, absolutely shameful.

"Mr. McFadden: Just a minute, please. I wish, if the court pleases, to object to the remarks of counsel to the jury.

"The Court: Note the objection.

"Mr. McFadden: I would like to preserve an exception to counsel's remarks and to counsel's argument to the jury.

"The Court: Yes, go ahead.

"Mr. Potter (continuing): He said he was a liar, didn't he? He said he lied under oath, didn't he? And the plaintiff had to sit here quietly, gritting his teeth and listen to it, didn't he? Counsel did a thing in this court room which he would not have the nerve to do, or the courage to attempt, outside of the court room.

"Mr. McFadden: I object to that.

"Mr. Potter (continuing): Do you think for a minute that Paulsen lied?

"Mr. McFadden: Just a minute, please, Mr. Potter, I wish again to say that I object to the argument of counsel to the jury. I object to the inflammatory remarks of counsel.

"The Court: Don't make any inflammatory remarks to the jury. Confine yourself to the evidence in this case.

"Mr. Potter: I have a right to reply to the argument of counsel.

"Mr. McFadden: I wish to preserve an exception to the remarks of counsel, and to the conduct of counsel.

"The Court:  Yes.

"Mr. Potter:  Does the court hold that my remarks are inflammatory?

"The Court:  Go ahead.  I am not passing on that.

"Mr. Potter (continuing):  No court would hold any such thing.  In the absence of a meritorious case, in the absence of any possible defense to this action, counsel contents himself by getting up and stating that this plaintiff is a liar and a perjurer, because, forsooth, he said that he did not see the brewery wagon coming down the street behind another wagon, when counsel conceives it is to the interest of his client that he should have seen it.  And this defendant, this brewing company, adds to the vice of running this man down unwarrantably in a public street, by employing an attorney to come in here before twelve of his fellow citizens and say that he is a liar and a perjurer.  I say that sort of thing is not warranted in any case, in any court room, and it is a dangerous thing for any lawyer to attempt.  Now, further, in addition to calling him a liar and a perjurer—

"Mr. McFadden:  I did not call him a liar.

"Mr. Potter (continuing):—he said he was a fakir—you said he lied.

"Mr. McFadden:  He did.

"Mr. Potter:  He did not lie; you know he did not lie.

"Mr. McFadden:  I maintain that he did.

"The Court:  Go ahead with the argument, gentlemen.  Proceed.

"Mr. Potter:  And counsel now says that he lies, doesn't he, and is a liar?  I say that every defendant who employs such a lawyer ought to be adequately punished.

"Mr. McFadden:  If the court please, I object to these inflammatory remarks.  I am not on trial here.  I wish the court to rule on them.

"The Court:  The objection will be sustained.

"Mr. McFadden:  I wish to preserve an exception to counsel's remark, and counsel's conduct and his attack upon me.

"The Court: The objection will be sustained on that.

"Mr. Potter: Now, I say that the conduct of any attorney—and I say it guardedly, coolly and without any passion, and without—

"The Court: Confine yourself to the case.

"Mr. Potter: I am arguing now as to the conduct of this case by the defendant's attorney.

"The Court: Confine yourself to the evidence.

"Mr. Potter (continuing):—the conduct of any attorney, who not only says that plaintiff lies, but who takes occasion during the attempted defense of that plaintiff to repeat that statement to the jury, that conduct, I say, is reprehensible. Now, then, if the court please, in addition to saying the man lied upon the stand, counsel says that he is a fakir; that he attempts to exaggerate his injuries. He cites, as evidence of that, that his counsel would not allow him to stand down in front of this jury and permit a slick attorney with a Cheshire cat grin upon his face to put him through a lot of paces.

"Mr. McFadden: Just a minute, I object to that, if the court please.

"The Court: I cannot remember what it was he said.

"Mr. McFadden: Will the reporter please read it?

"The Court: Well, go ahead, the exception will be allowed.

"Mr. McFadden: I desire also to preserve an exception to counsel's remarks.

"The Court: Go ahead.

"Mr. Potter (continuing): Counsel would have had him stand up here; counsel would have stood this plaintiff up before this jury and would have attempted to get in front of him and have him go through with a lot of motions; he would thereby have attempted to cover this plaintiff's case with ridicule. Now, this plaintiff has at no time claimed that he cannot bend his knee. He has at no time claimed that he cannot bend his ankle. You gentlemen have seen him walk about this court room. There has not been a single

action of his which has been an attempt or was an attempt to impress this jury with the extent of his injuries. He has not said that he could not do work, but he has said that he could not do the work which he formerly did, which required him to be on his knees for a long time at a stretch; that he tried to do it for three weeks and found out that he could not do it. His doctor says that he cannot do it. He has told you the condition of his leg. You have an X-ray which shows the condition of his leg, establishes the condition of his leg. Counsel could have shown his leg to the jury if he had wanted to. He could have done that. It was entirely proper, and I was entirely within my rights and those of the plaintiff when I refused to permit this attorney for this defendant to cast ridicule upon this plaintiff, by putting him through a lot of ridiculous motions before this jury. I say that the claim of the defendant's attorney that this claim is not made in good faith, that this plaintiff has not told the truth, or attempted to, that he is a perjurer, that he lied, that he is a fakir—those contentions are all of them absolutely unwarranted by this evidence. And I say that they arise, not out of anything that has occurred on this trial, but out of the desperation of this defendant's attorney, and out of the fact that the defendant has no defense.''

In the course of that argument and colloquy, the trial judge twice admonished counsel for the plaintiff with the remark: ''Don.'t make any inflammatory remarks to the jury.'' In one instance, when counsel for the defendant objected to the remarks of counsel for the plaintiff, the court announced that an exception would be allowed, and on another occasion, when counsel for the defendant objected to the remarks of counsel for the plaintiff, the court said: ''Note the objection.'' And, later on, when counsel for the defendant expressed a desire to preserve an exception to the remarks and the conduct of counsel for the plaintiff, the court said: ''Yes.'' Then counsel for the plaintiff asked the trial judge if he held that the

remarks of counsel for the plaintiff were inflammatory, in answer to which, the court said: "Go ahead, I am not passing on that." Further, on one occasion, when counsel for the defendant asked the court to rule on the utterances of plaintiff's counsel as inflammatory, the trial judge said: "The objection will be sustained." Then, a moment later in the case, the trial judge twice told counsel for the plaintiff to confine himself to the case or to the evidence.

From the foregoing it will be seen that none of the inflammatory utterances of the plaintiff's counsel were withdrawn from the record, and, although various objections were sustained, those rulings of the trial judge did not sensibly diminish the prejudicial effect of those utterances. The statement of counsel for the plaintiff in the course of his closing argument, "I say that every defendant who will employ such a lawyer ought to be adequately punished," is an effort to persuade the jury to bring in a verdict in part based on the ground that the defendant should respond to the plaintiff in damages because it had employed the particular counsel that then represented it in court. The mere statement of those facts demonstrates not only the unreasonableness of the utterances but gives rise to the conclusion that the only effect it could have on the minds of the jury was obviously prejudicial to the defendant.

Further, the words of counsel for the plaintiff, "Now I say that the conduct of any attorney—and I say it guardedly, coolly, without any passion, and without * * * the conduct of any attorney, who not only says that the plaintiff lies, but who takes occasion during the attempted defense of that plaintiff to repeat that statement to the jury, that conduct, I say, is reprehensible. Now, then, if the court please, in addition to saying the man lied upon the stand, counsel says that he is a fakir; that he attempts to exaggerate his injuries. He cites, as evidence of that,

that his counsel would not allow him to stand down in front of this jury and permit a slick attorney with a Cheshire cat grin upon his face to put him through a lot of paces," were not only unjustifiable, when the conduct of the defendant's attorney is considered as the record shows it, but highly improper and must be considered as having been uttered with the intention of wrongfully influencing the jury to consider, in arriving at their verdict, the conduct of the defendant's counsel. That whole statement was not only improper and misleading but tended to give rise in the minds of the jurors to notions and thoughts prejudicial to the just rights of the defendant. The language of counsel for the plaintiff, "There is no defense to this action. He knows it, I know it, you know it. So he conceived that it is his duty in the interest of this brewery company to come in here and compel this poor man Paulsen to sit here on the front seat—" was not proper. *Williamson v. Hirsh, Stein & Co.,* 147 Ill. App. 500; *Pierce v. L. Wolff Mfg. Co.,* 154 Ill. App. 660. Both Paulsen and the brewery company had rights, and counsel for the plaintiff was not entitled under the law to undertake to make any invidious distinction between them. Such a statement might easily have given rise in the minds of the jurors to an unwarranted prejudice against the defendant.

The law is well stated by the Supreme Court in *Bishop v. Chicago Junction Ry. Co.,* 289 Ill. 63, in which case a judgment for $15,000, which had been affirmed by the Appellate Court, was reversed on account of the prejudicial remarks and conduct of counsel. The opinion in that case contains the following language:

"While it is true that at times, in closely contested cases, counsel may inadvertently say that which is prejudicial, the influence of such a statement may generally be overcome by sustaining objections thereto

and by retraction on the part of offending counsel
made in good faith, yet where it would appear, as it
does here by frequent instances, that counsel has in
the presence of the jury indulged in acts and state-
ments prejudicial to the rights of the opposite party,
and which tend to indicate that he was seeking what
might be gained from such prejudice of the jury, such
misconduct will amount to a mistrial of the cause,
unless it can be seen that it did not result in injury
to the plaintiff in error.   We cannot so hold here.
The evidence was conflicting and the verdict returned
was for a large sum.   While it is unfortunate that
this case must be reversed for these reasons, yet it
is a misfortune visited upon defendant in error by
his own attorney.   When intelligent counsel persists
in conduct which he knows may result in setting aside
the verdict of the jury, if he secure one, he is thereby
deliberately taking chances with his client's rights.
As was said in *Bale v. Chicago Junction Ry. Co.*, 259
Ill. 476, where prejudicial remarks were made, objected
to and objection sustained: 'This kind of argument
cannot be justified, and if wilfully persisted in will
justify the reversal of a judgment, even though the
court has sustained objections to it.   It is, of itself,
sufficient reason for granting a new trial.' "

In *Illinois Cent. R. Co. v. Seitz,* 111 Ill. App. 242,
the court said:

"There is enough natural and inherent prejudice
in the minds of jurors against railroads and other
corporations without having it augmented by direct
and improper appeals calculated to arouse the sym-
pathy, passion or prejudice of jurors."

In *Eilers v. Peoria Ry. Co.,* 200 Ill. App. 487, the
court said:

"The whole purpose of the law to obtain a trial
by fair and impartial jury is defeated if appeals to
their passions and prejudices are to be permitted
during the course of the trial." *Bale v. Chicago
Junction Ry. Co.,* 269 Ill. 476; *McCoy v. Chicago &
A. R. Co.,* 268 Ill. 244; *Chicago & A. R. Co. v. Scott,*
232 Ill. 419.

The argument made by counsel for the defendant to the jury was fair and temperate. He challenged the credibility of the plaintiff, but that he had a right to do. *Chicago & A. R. Co. v. Scott,* 232 Ill. 419. On the other hand, we are of the opinion that a number of the utterances of counsel for the plaintiff were extreme and beyond the limits of fair argument and tended to arouse the prejudice and passions of the jury.

As. to the contention of counsel for the defendant that the verdict and judgment were against the clear and manifest weight of the evidence, we are of the opinion that, quite obviously, there was ample proof on the part of the plaintiff to justify its submission to the jury and, further, to support a verdict for the plaintiff; and, as to the contention that the verdict and judgment were excessive, we are of the opinion that that claim is untenable  Believing as we do, therefore, that the defendant did not have a fair trial, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

O'CONNOR and THOMSON, JJ., concur.