CHICAGO—FIRST DISTRICT—OCTOBER, 1918.   271

Wilson v. Chicago Heights Term. Transfer R. Co., 212 Ill. App. 271.

## George A. Wilson, Appellee, v. Chicago Heights Terminal Transfer Railroad Company, Appellant.

### Gen. No. 23,260.

1. COMMERCE, § 4*—*when shown that train engaged in interstate.* In an action under the Federal Employers' Liability Act [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], that the train causing the injury contained shipments originating in one State and destined to another and was engaged in interstate commerce, *held* established by competent evidence.

2. MASTER AND SERVANT, § 689*—*when verdict for plaintiff sustained by evidence in action under Federal Employers' Liability Act.* In an action under the Federal Employers' Liability Act, [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], where the negligence relied upon to sustain a recovery is defendant's failure to exercise reasonable care to maintain its track and roadbed in a reasonably safe condition and state of repair, and in operating its locomotive at a high and dangerous rate of speed, the evidence, though conflicting, *held* sufficient to sustain a verdict for plaintiff.

BARNES, J., dissenting.

3. MASTER AND SERVANT, § 454*—*what is insufficient to charge locomotive fireman with knowledge of condition of ties.* In an action by a locomotive fireman brought under the Federal Employers' Liability Act [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], to recover for personal injuries alleged to have been caused by defendant's negligence in maintaining its track and roadbed and in operating its train, plaintiff is not chargeable with knowledge of the condition of the ties because he frequently rode over that part of the track in discharging his duties and occasionally walked along it.

4. APPEAL AND ERROR, § 1523*—*when mistake in date in instruction not ground for reversal.* A mistake in giving a date in a long instruction is not ground for reversal where, in reading the instruction as a whole, the date intended is apparent.

5. APPEAL AND ERROR, § 1523*—*when misstatement of name of city in instruction is harmless error.* A harmless misstatement in giving the name of a city in an instruction is not ground for reversal where, by reason of the context, the jury could not have been misled.

6. APPEAL AND ERROR, § 1241*—*when instruction may not be complained of.* A defendant cannot complain of an instruction given at plaintiff's request where the same instruction was given at defendant's request.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number,

7. Master and servant, § 98*—*when instruction on damages in action under Federal Employers' Liability Act is not reversibly erroneous.* In an action under the Federal Employers' Liability Act [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], that an instruction which deals merely with the question of damages and does not purport to outline all of the elements necessary to a recovery, does not embody such elements of recovery, among them the doctrine of assumed risk, is not ground for reversal, especially where it tells the jury that if they find from a preponderance of the evidence and the instructions of the court, etc., then they may assess damages as proven by the evidence.

8. Damages, § 191*—*when question as to causal connection between first and second injuries is for jury.* In an action under the Federal Employers' Liability Act [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], for injuries to plaintiff's leg, where it appears that about 10 months after the injury, when plaintiff had discarded his crutches for a cane in accordance with his doctor's advice, he injured his leg again by placing his weight upon it to recover his balance which he had lost in lifting his child, the question as to whether there was a causal connection between the first and second injuries is for the jury.

9. Damages, § 120*—*when not excessive.* In an action under the Federal Employers' Liability Act [Callaghan's 1916 St. Supp. ¶ 9096(1) *et seq.*], where it appears that plaintiff's left leg was crushed, with the result that it is shorter than the right, his entire right side was scalded, that he was unable to be about for many months and suffered intense pain, and his injuries are permanent and his earning capacity greatly impaired, a verdict for $18,725.51 is not excessive.

Appeal from the Superior Court of Cook county; the Hon. Clinton F. Irwin, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1917. Affirmed. Opinion filed October 15, 1918. Rehearing denied October 25, 1918. *Certiorari* denied by Supreme Court (making opinion final).

Winston, Payne, Strawn & Shaw, for appellant; Edward Warren Everett and Harold Beacom, of counsel.

David K. Tone and Frank A. Rockhold, for appellee.

Mr. Presiding Justice McDonald delivered the opinion of the court.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Wilson v. Chicago Heights Term. Transfer R. Co., 212 Ill. App. 271.

This is an appeal from a judgment for $18,725.51, recovered in an action for personal injuries, brought under the Federal Employers' Liability Act.

The declaration alleged that plaintiff was injured while employed as a fireman on one of defendant's locomotives, while engaged in moving cars containing interstate shipments. The negligence relied upon to sustain a recovery was that defendant had failed to exercise reasonable care to maintain its track and roadbed in a reasonably safe condition and state of repair, and in operating its locomotive at a high and dangerous rate of speed thereon.

Defendant's locomotive was derailed and tipped over while pulling a train of freight cars around a curve on defendant's track (referred to by the witnesses as the Montgomery Ward curve), whereby plaintiff was pinned under the wreckage and sustained the injuries complained of.

It is contended, first, that there is no competent evidence in the record tending to show that at the time of the accident any of the cars in defendant's train were being used in interstate commerce.

The evidence shows that certain of the cars comprising defendant's said train contained shipments originating in one State and destined to points in another. And while the admissibility of some of this evidence is questioned by defendant, we are of the opinion that the interstate character of defendant's said train at the time of the accident has been established by competent evidence.

It is next contended that the evidence shows that defendant exercised ordinary and reasonable care in the maintenance of its track and roadbed and in the operation of its said train at and prior to the time of the accident.

On behalf of plaintiff five witnesses—including plaintiff's brother who for many years prior to and at the time of the trial was also in defendant's employ as

a locomotive fireman—testified as to the condition of the ties at the place of the accident immediately after it occurred. The witness Lueder testified that 25 or 30 of the ties in the said curve were rotten, and that 15 or 20 of them were broken by the wheels of the locomotive in passing over them. The witness Paulsen testified that the rails were spread, ties were rotten for about two rail lengths; that the spike holes were all rotten and that the spikes were loose. On cross-examination he admitted that the breaks in the ties "looked new." The witness McAtee testified that he saw ties broken with ends sticking up, rails twisted; that whole parts of some ties were rotten; that there were seven or eight of these ties in track where engine jumped; that probably 25 or 30 of the ties had wheel marks; that some were cut nearly through and the better ones were not so deeply cut. The witness La Claire testified that there were about 25 or 30 ties that were cut by the flanges of the wheels; that where the ties were so cut, they looked rotten and spikes were loose. Plaintiff's brother stated that about 25 or 30 of the ties were rotten and that the spikes pulled out.

On behalf of the defendant, nine witnesses testified as to the condition of the roadbed at said time and place, and particularly as to the condition of the ties which were broken by the wheels of the locomotive in passing over them. The witness Bach, who was in charge of the wrecking crew that removed the wreckage, testified that they replaced 9 broken ties, and that the breaks in the ties removed looked new. Jensen, track foreman for defendant, testified that the broken ties looked "perfectly sound"; that they removed but 6 broken ties; that during March and April, 1914, he walked over the track every 2 or 3 days, at which times it appeared to be in good condition; that in 1913 they took out and replaced a great many ties in the curve, which were a "little rotten at the ends and would not hold spikes." Beaudry, superintendent of the Elgin,

Joliet & Eastern Railway, who was at the scene of the accident with the wrecking crew, testified that about 50 feet of track was torn up and lying about a foot out of place; that the ends of perhaps 10 or 15 ties were cut off and about 35 damaged, where the engine ran over them after it was derailed; that the breaks in the ties looked new and that none of the spikes had pulled out. Varga, a member of the wrecking crew, stated that the broken ties were of hard oak and did not look very bad. Kapinus, another member of the wrecking crew, testified that some of the broken ties looked new and some looked old. On cross-examination he admitted that some ties "looked rotten and some did not." Manno, a section hand, stated that they replaced 6 broken ties; that the broken ties looked "pretty good"; that none were rotten; that the track looked "pretty good" before the wreck. Franze, also a section hand, testified that the broken ties looked good. Nardi, another section hand, testified that the breaks in the ties looked new; that the condition of the track before the derailment was good. Angella, another section hand, testified substantially to the same effect.

In addition to the foregoing, defendant introduced the testimony of ten witnesses who in the course of their duties had occasion to make a casual observation of defendant's roadbed. Their testimony was to the effect that it always appeared good—ties apparently sound, etc. One of these witnesses—Eaken, a section foreman employed by the Chicago & Eastern Illinois Railroad—admitted on cross-examination, however, that the proper way to inspect ties that looked old and dirty was to drive a pick into them to determine whether ties apparently sound on the outside were decayed and unsound on the inside. None of these ten witnesses claimed to have made more than a casual inspection of the roadbed at any time. Two of these witnesses also testified that they noticed 8

spikes were used to a tie, around the entire curve. This was disproved, however, by photographs admitted in evidence on behalf of both the plaintiff and the defendant. Some of the witnesses also testified that during the spring of 1913 upwards of 130 ties had been put in at the Montgomery Ward curve; that the ties so used were of the highest quality oak. The witness Mueller stated that the ties so used "covered the entire length of the curve," which he later stated was about seven or eight hundred feet. An examination of the photographs in evidence reveals that at the time and place of the accident but a few of the ties in defendant's roadbed looked new. And Mueller's admission that the curve was seven or eight hundred feet long qualifies his statement that 130 or 140 ties "covered the entire length of the curve."

Defendant introduced also the testimony of six other witnesses who claimed to have had considerable experience in railroad track construction, who testified that trains could safely pass over defendant's roadbed at a speed of from 15 to 20 miles per hour. Five of these witnesses based their opinions upon a joint inspection made of defendant's track in September, 1916—more than 2 years after the happening of the accident. The other witness apparently based his testimony upon the statements of the five who made the inspection just referred to. All this testimony was predicated upon the claim of defendant that the condition of its roadbed was substantially unchanged from the time of the accident to the time the five witnesses made the inspection.

Mulholland, superintendent of defendant, was asked on cross-examination whether he had ever issued an order directing engineers to reduce the speed of their trains because of the condition of defendant's roadbed, to which he answered in the negative, stating that a train could safely pass over the said curve at the rate of from 20 or 25 miles per hour, and that there

never was any occasion to reduce speed because of track conditions. Later, when confronted with what purported to be a slow-down order bearing his name, the witness admitted that on January 21, 1916, he issued the following order:

"Engineers and trainmen:
"Present condition of our roadbed makes it necessary for you to reduce speed to five miles per hour on all of our tracks, to avoid possible derailments."

His explanation for this order was that rain, snow, frost and thaw had affected the roadbed and hence made the order imperative. Thereupon another slow-down order bearing date June 4, 1914, was shown to the witness, which he admitted having also issued at a time when the aforesaid weather conditions did not exist, but stated it was given at the special instance of the general manager of the defendant company.

There was some variance in the testimony as to the speed of defendant's train at and just prior to the time of the accident. Defendant's witnesses fixed it at from 6 to 12 miles per hour, while plaintiff's witnesses placed it at from 10 to 15.

Northrup, the engineer of defendant's train at the time of the accident, testified that it was his duty to observe the rails from the cab of the locomotive while the train was moving; that he did so just before the accident, but noticed no obstruction of any kind thereon.

We have discussed the testimony in detail because of defendant's vigorous contention that the verdict is clearly and manifestly against the weight of the evidence. The logic of defendant's argument in support thereof is, that inasmuch as the evidence shows by an overwhelming preponderance that its roadbed at the time of the accident was in a good state of repair, capable of safely operating trains over it at a speed of 20 miles per hour, it cannot be charged with negligence

because of the derailment of one of its trains while moving at a much lower rate of speed.

While it is true that nine witnesses for defendant testified that the broken ties were otherwise sound, and that plaintiff produced only five who testified that they appeared rotten, yet the fact that defendant had the greater number of witnesses on this point was but a circumstance to be considered by the jury in connection with the other facts and circumstances in evidence. All of the witnesses who testified regarding the broken ties were in an equal position to judge of their condition. In view of the conflict in their testimony, the credibility of the witnesses was an important element to be considered by the jury. It must also be borne in mind that the testimony of the ten witnesses on behalf of defendant, who based their statements upon casual observations of the roadbed, was somewhat nullified by the admission of defendant's witness Eaken, that the proper way to inspect an old or dirty looking tie was to drive a pick into it. We think it also a just inference that some of defendant's witnesses were over-zealous in their efforts to substantiate defendant's claim as to the condition of its roadbed. This became apparent when plaintiff introduced the photographs hereinabove referred to, showing the condition of the roadbed immediately after the derailment. And the other testimony offered on behalf of defendant respecting the alleged condition of its roadbed at the time of and subsequently to the accident must be viewed in the light of Mulholland's admission regarding the slow-down orders issued by him on June 4, 1914, and on January 21, 1916, respectively. All of the foregoing circumstances had a direct bearing upon the question of liability. The jury by their verdict have resolved the issues in favor of the plaintiff; and when viewed in the light of all the evidence in the case, together with the inferences that reasonably flow therefrom, we cannot say that such verdict is clearly and

manifestly against the weight of the evidence. To hold otherwise on the evidence as disclosed by the record before us would be tantamount to a denial of the right of trial by jury.

It is next contended by defendant that plaintiff is barred from a recovery, on the doctrine of assumed risk. Stress is laid upon the fact that plaintiff was in a position to observe the condition of the roadbed from the locomotive cab, and it is also argued that inasmuch as plaintiff had been employed by defendant for a number of years, during which time he frequently rode and occasionally walked over defendant's track, he was presumed to know the condition of the roadbed.

Under the evidence in this case, we are of the opinion that plaintiff, whose duty it was to shovel coal into the fire box of a moving locomotive, could not be charged with knowledge of the condition of the ties of the roadbed over which the engine was passing. And while it may be conceded that at times he was in a position to observe parts of the track and roadbed over which his train was passing, yet the nature of his work rendered it impossible to observe all parts of it. We find no evidence in the record tending to show that it was part of plaintiff's duty to inspect the roadbed. Nor can he be charged with knowledge of its condition which would bar a recovery, because he occasionally walked over the track, for it is undisputed that the proper way to inspect old and dirty looking ties is to drive a pick into them.

Complaint is made of the giving of certain instructions on behalf of the plaintiff.

Instruction No. 2 was to the effect that if the jury found from the evidence that plaintiff and defendant were engaged in interstate commerce on May 27, 1914, etc. It is contended that as the accident occurred on April 27, 1914, this instruction was misleading and that the giving of it constituted reversible error. We cannot agree with this contention. The said instruc-

tion was rather long, and in several instances referred to the "time of the accident in question." In reading the instruction as a whole, the conclusion is irresistible that the date referred to as May 27, 1914, must have been understood by the jury to mean April 27, 1914, the time of the accident.

The said instruction also referred to a shipment originating in Chicago Heights, Illinois, and destined to a point beyond the State of Illinois. At one place the instruction omitted the word "Heights" after "Chicago," so that it read, "from Chicago, Illinois, to a place beyond the State of Illinois." We think, however, this was also a harmless misstatement which, in view of the context, could not have misled the jury to defendant's prejudice.

Instruction No. 7 directed the jury to allow defendant for moneys already paid out by defendant to plaintiff under the Illinois Workmen's Compensation Act, "as evidenced by the receipts." It is contended by defendant that moneys were paid out by defendant in addition to that evidenced by the receipts; that the jury allowed only $1,274.49 under this instruction, whereas they should have allowed considerably more. We find, however, that instruction No. 33 given on behalf of the defendant expressly directed the jury that if they found the issues for plaintiff they should deduct $1,274.49 from any amount they found plaintiff was entitled to recover. Defendant is therefore not in a position to complain of instruction No. 7 given on behalf of plaintiff.

Instruction No. 8 is complained of because, it is alleged, it directs a verdict without embodying all the elements requisite to a recovery, particularly the doctrine of assumed risk. The instruction in question dealt merely with the question of damages and did not purport to outline all the elements necessary to a recovery. Furthermore, it told the jury that if they found from a preponderance of the evidence and the instructions

of the court, etc., then they might assess damages as proven by the evidence, etc. We think the instruction was proper. *Bonato v. Peabody Coal Co.*, 248 Ill. 422.

The further point is made by defendant that the damages awarded plaintiff are excessive.

The evidence shows that about 10 months after receiving the first injury, and before plaintiff had fully recovered therefrom, he suffered a second injury to his leg, which proved quite severe. Some weeks prior to the second injury plaintiff, upon the advice of his physician, dispensed with the use of his crutch and attempted to use the injured limb with the aid of a cane. In an effort to lift his one and one-half-year-old child from a chair, he became overbalanced and shifted his weight on the injured leg which gave way and caused him to fall and break the femur thereof a second time.

Defendant argues that there is no evidence tending to show a causal connection between the first and second injuries. However, as we view the evidence in this case, the question whether or not there was a causal connection between the two injuries was one of fact, which the court properly submitted to the jury for determination. *Seith v. Commonwealth Elec. Co.*, 241 Ill. 252; *Devlin v. Chicago City Ry. Co.*, 210 Ill. App. 7.

There can be no doubt that plaintiff was seriously injured. His left leg was crushed and his entire right side was scalded when defendant's locomotive left the rails and tipped over. He was unable to be about for many months after the injury, during which time he suffered intense pain. His left leg is now considerably shorter than the right; his injuries are permanent, impairing his earning capacity greatly. In such circumstances we cannot say that the damages assessed are excessive, particularly in view of the fact that in recent years the purchase power of money has greatly diminished.

Other points have been raised, which we consider of

minor import and not of sufficient moment to disturb the judgment, and hence we shall not dwell upon them. After a most careful examination of the evidence and a thorough consideration of the points raised by defendant, we are of the opinion that the defendant has had the benefit of a fair and impartial trial, and that the verdict of the jury was rendered under instructions which fully and correctly set forth the law governing the rights of the parties.

Accordingly the judgment will be affirmed.

*Affirmed.*

Mr. Justice Barnes dissenting.

I think the verdict is against the manifest weight of the evidence, not only on the questions of defective conditions and dangerous speed, but on the question of the exercise of ordinary care to keep the track in a reasonably safe condition, and that the accident was one of the ordinary dangers incident to the service which was assumed in the contract of hire.