**William Snedden, Appellee, v. Illinois Central Railroad Company, Appellant.**

### Gen. No. 7,285.

1. APPEAL AND ERROR—*refusal to decide unnecessary questions on appeal.* On appeal from a judgment for plaintiff in an action for personal injuries where the verdict was based upon but one count of the declaration, which was drawn upon the theory that plaintiff was a trespasser upon defendant's track at the time of his injury, and the court instructed the jury that he was a trespasser, it is unnecessary to determine the exact relation between plaintiff and defendant at the time of the injury.

2. DIRECTING VERDICT—*directed verdict properly refused where there is evidence in support of declaration.* Where there was evidence fairly tending to support the allegations of the declaration, the trial court did not err in refusing to direct a verdict at the close of the evidence.

3. NEGLIGENCE—*elements of wanton negligence.* Though it is unnecessary to show ill will to establish a wanton act, the party doing the act or failing to act must be conscious of his conduct

and be conscious from his knowledge or from surrounding circumstances and existing conditions that his conduct will naturally and probably result in injury.

4. APPEAL AND ERROR—*duty to affirm on evidence where verdict not manifestly against weight*. It is the duty of the court on appeal to affirm a judgment, as far as the evidence is concerned, unless it can be said that the verdict is manifestly against the weight of the evidence.

5. RAILROADS—*sufficiency of evidence of wilful and wanton negligence toward trespasser on track*. In an action for personal injuries received by plaintiff when defendant's switching crew backed its engine on a sidetrack against a string of cars under which plaintiff and other employees of an adjoining plant were eating their dinners, where the preponderance of the evidence showed that preparations were not made for switching during the noon hour; that plaintiff was accompanied by his boss who would have known if switching was to be done then; that the switch engine passed on an adjoining track less than 30 feet away shortly before the accident and some of the men under the cars waved to the engineer and he waved back; and, notwithstanding the fact that he saw the position of plaintiff and others he soon came in upon the track on which they were sitting and, without warning, struck the cars, a verdict finding that his act constituted wilful and wanton negligence will not be disturbed.

6. RAILROADS—*propriety of modifying instruction in action for negligence towards trespasser on track*. In an action for personal injuries based upon wanton negligence of defendant's engineer in backing his engine without warning against cars under which plaintiff and others were sitting while eating their dinners, the court did not err in modifying defendant's instruction as to knowledge on the part of defendant's employees of the dangerous position of plaintiff by including others who were with plaintiff where such modification was in accord with the declaration and did not materially change the meaning of the instruction, especially where practically the same language was used in another instruction given as requested by defendant.

7. INSTRUCTIONS—*propriety of striking out one of two distinct propositions in instruction*. Where an instruction as offered contained two distinct propositions the court did not err in striking out one of them where the part given was correct and that omitted was covered by other instructions.

8. RAILROADS—*sufficiency of declaration for injuries to trespasser on tracks*. A declaration in an action for personal injuries which alleged that defendant's servants wilfully and wantonly drove its locomotive against the end car of a string of standing cars under one of which plaintiff was sitting was not subject to

the objection that it failed to state a cause of action in that the relation of the end car to the one under which plaintiff was sitting was not stated.

9. DAMAGES—*excessiveness of verdict.* A verdict for $25,000 for the loss of plaintiff's right arm cannot be said to be so excessive as to require reversal where plaintiff was fifteen years old at the time of the injury and testified that at the time of the trial, over six years afterward, the arm still caused him some pain and trouble and the action was based on wanton negligence so that exemplary damages were allowable.

10. NEW TRIAL—*procedure in overruling motion as review of evidence.* In overruling a motion for a new trial, entering judgment on the verdict and signing the bill of exceptions, the trial court in effect held that the evidence sustained the verdict and that plaintiff was entitled to judgment.

Appeal by defendant from the Circuit Court of La Salle county; the Hon. EDGAR ELDREDGE, Judge, presiding. Heard in this court at the October term, 1923. Affirmed. Opinion filed July 24, 1924. *Certiorari* denied by Supreme Court (making opinion final).

WOODWARD, HIBBS & POOL, for appellant; JOHN G. DRENNAN, of counsel.

DUNCAN & O'CONOR and HOWARD H. BAYNE, for appellee.

MR. JUSTICE PARTLOW delivered the opinion of the court.

Appellee, William Snedden, recovered a judgment for $25,000 in the circuit court of LaSalle county against appellant, Illinois Central Railroad Company, for the loss of his right arm, and an appeal has been prosecuted to this court.

The first errors urged are that the court at the close of the evidence improperly refused to direct a verdict for appellant, and that the verdict is contrary to the evidence. The accident happened on July 12, 1912, at the plant of the Chicago Portland Cement Company, now the Lehigh Cement Company, in Oglesby, Illinois, which is three and one-half miles south of

the City of LaSalle. At that time appellee was a few days over fifteen years of age. He reached his majority on July 25, 1918, suit was commenced on November 18, 1918, and the trial began on April 25, 1923. The appellant's tracks extend through Oglesby, north and south, and the cement plant is immediately east of the main line. At the northwest corner of the ground of the cement company there was a switch track which left the main line and ran in an easterly direction to what is commonly called the Crow's Nest. Track number 7, which was a switch track, extended from the Crow's Nest in a southwesterly direction for a short distance and then went straight south past stock house number 2 of the cement company, and about 30 feet east thereof. As it extended south, the track ascended at the rate of 2.3 feet in a hundred feet and crossed Walnut street, the main street of Oglesby at right angles, about 500 feet south of the stock house. Seventeen and one-half feet south of Walnut street a switch track known as number 6 track left number 7 track and extended north 996 feet on the west side of number 7 track, and parallel with it. Number 6 track extended along and immediately adjacent to the east side of the stock house. Number 6 track was a stub track, having no connection with any other track except with number 7, near Walnut Street. It was used to hold cars while being loaded and unloaded at the stock house. It held fourteen cars from the south end of the stock house to track number 7, the distance being 468 feet. It held twelve cars north of the south end of the stock house, being the remaining length of the switch. In loading cars on number 6, the empty cars were placed at the north end. The south car was loaded first, was then pushed to the south and the next car in succession took its place. Track number 6 at the south end descended in a northerly direction for a distance of 200 feet, 11 inches to the hundred feet, and

238    APPELLATE COURTS OF ILLINOIS.

Snedden v. Ill. Cent. R. Co., 234 Ill. App. 234.

from that point it ascended to the north end, 7 inches to the hundred feet. At a point 32 feet north of the south end of the stock house the distance from the center of track 6 to the center of track 7 was 27.2 feet and at this same point number 7 track was 9.12 feet lower than number 6 track. At the point where number 6 track left number 7 the latter extends south and connects with the Milwaukee main line. Number 6 track was on the land of the cement company, but all of the switch tracks were owned by the several railroad companies operating them, including appellant. There was a contract between these railroad companies providing for the joint use of these tracks by all of these companies.

Stock house number 2 was 261 feet long north and south, and 70 feet wide east and west. The south end of the building was known as the bag house and sacks were stored in it. The north end was known as the stock house and in it cement was stored, sacked and was then loaded on cars. There was a loading platform between the stock house and track number 6 extending along the east side of the building. It was 126 feet long, and 8 feet 4 inches wide, with an overhang of 2 feet. The clearance between the bottom of the overhang and the ground underneath varied from 4 feet 11 inches to 3 feet 11 inches. When a car was standing on number 6 track next to the loading platform, there was a space of 19 inches between the car and the edge of the platform, and when cars were being loaded, iron sheets were placed over this opening so trucks could be pushed into the car. The stock house was operated from seven o'clock in the morning until five-thirty in the afternoon, with an intermission of thirty minutes at noon.

On the day of the accident there were between thirty and thirty-five men employed in the stock house, fifteen of whom were working in the bag house. William Burke was in charge of the bag house, under Transau,

the foreman. Appellee was working in the bag house under Burke and had been employed there about two months sorting and unloading cement sacks. On this morning, there were twelve cars standing on number 6 track north of the south end of the stock house waiting to be loaded. During the morning eight or nine of these cars were loaded with cement. The next car to be loaded contained sacks and between ten and eleven o'clock the men started to unload these sacks, the car being set opposite the south door of the stock house. North of this car were two other cars and the men began to load them with cement. At noon the sack car was not completely unloaded and the two other cars were not completely filled with cement. When the whistle blew at noon four or five men, including Burke and the appellee, took their dinner pails, went through the sack car, got down on the east side, and crawled underneath to eat their dinner. While eating, three of the men sat under the car with their legs across the east rail facing east, all sitting in a line between the trucks. One man was sitting on the east rail near the north truck facing east. The appellee was sitting with his back against the north end of the north wheel of the south truck on the east side. Three other men were sitting in the east doorway of this same car, and there were several men under the cars all along north of the bag car.

While the men were in these positions, an engine of appellant pulling two cars of coal went south on number 7 track. The engine was headed south and was running about five to eight miles per hour. The engineer was on the right hand, or west side, of the cab. He was about 27 feet from the men who were sitting under these cars with nothing to obstruct the view. Several of the men who were sitting under this car testified that as the engine went past they waved to the engineer, and he either waved back or nodded his head. This was about 12:10 p. m. and a few minutes

afterwards the switch engine backed in on number 6 track, bumped into the string of cars under which these men were sitting, and shoved the cars to the north. The evidence on behalf of the appellee showed that the cars were moved from six to eight feet, and the evidence on behalf of the appellant showed they traveled a much shorter distance. The evidence on behalf of the appellee is that no signal or warning was given of the intention of this engine to come in on number 6 track. Appellee's belt was caught by a bolt on the car, he was dragged six or eight feet, and his right arm was run over and crushed so that it had to be amputated.

There is considerable conflict in the evidence as to whether there had been any switching on track number 6 before twelve o'clock on the day of the accident, and whether any notice had been given that there would be switching on that track at the noon hour. On behalf of the appellant the evidence shows that during the morning Transau, who was in charge of the stock house, told the chief clerk of the cement company to have the appellant bring four empty box cars to stock house number 2, to be loaded; between eleven and eleven-thirty appellant's switching crew went in on the cement company's track to switch. The foreman of the switching crew went up to the office, was notified by the chief clerk to bring four empty box cars to the stock house, and to do such switching as the superintendent should direct. The engine foreman consulted the superintendent, who directed him to take out the eight or nine loaded cars of cement, to pull out all of the cars standing on number 6 track, and put them back again with the four empty cars at the north end of number 6 track; that it was then almost twelve o'clock; that the superintendent stopped the loading of the cars at that time, moved the iron sheets from across the doors, and went to his dinner; that the crew

then took out five loads of cement, went down number 7 track and left them at number 1 stock house; that while they were there the noon whistle blew. They went south on number 7 track to number 6 track; that while they were going up number 7 track the engine faced south and was drawing two cars; that they then backed in on number 6 track, and that the crew had no knowledge that there were any men underneath the cars on track 6; that the crew coupled on to the cars on number 6 track at the south end, and in so doing they moved the cars forward two feet.

The evidence on behalf of appellee shows that no cars were moved from track 6 on the day of the injury; that the switching crew did not come up track 6 until after the whistle blew; that they brought two cars of coal; that the engine went south on track 7 past the car under which the appellee and his friends were sitting and proceeded south to the switch just south of Walnut Street, and then backed in on track number 6, and without warning struck the car under which appellee was sitting, and he was injured; that the crew then put the cars of coal in the coal yard, which was on another track, and that they did not thereafter on that day return to or move any cars off of track 6.

Considerable space is taken up by appellant in arguing the question as to whether or not the appellee was a trespasser and the duty which the appellant owed him. The verdict is based upon but one count of the declaration which is drawn upon the theory that appellee was a trespasser and appellant wilfully and wantonly injured him. The court instructed the jury that the appellee was a trespasser. For these reasons we do not deem it necessary to determine just what relation appellee sustains to the appellant. In order for this verdict to be sustained it must be upon the theory that appellee was a trespasser, and that appellant wilfully and wantonly injured him.

242        APPELLATE COURTS OF ILLINOIS.

Snedden v. Ill. Cent. R. Co., 234 Ill. App. 234.

It is a well-settled rule of law that if there is no evidence or but a scintilla of evidence tending to prove the material averments of the declaration, the jury should be directed to return a verdict for the defendant. If, however, there is in the record any evidence from which, if it stands alone, the jury could, without acting unreasonably in the eyes of the law, find that all of the material averments of the declaration have been proved, then the cause should be submitted to a jury. *Libby, McNeill & Libby v. Cook*, 222 Ill. 206; *McFarlane v. Chicago City R. Co.*, 288 Ill. 476; *Walldren Express & Van Co. v. Krug*, 291 Ill. 472. There is evidence fairly tending to support the allegations of the declaration, and for that reason the court was not in error in refusing to direct a verdict at the close of the evidence.

In order to establish a case of wanton and wilful injury, it is not necessary that there be any ill will. To constitute a wanton act the party doing the act or failing to act must be conscious of his conduct, and though having no intent to injure, must be conscious, from his knowledge or surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury. *Jeneary v. Chicago & I. Traction Co.*, 306 Ill. 392; *Walldren Express & Van Co. v. Krug, supra*. Where the omission to exercise care is so gross that it shows a lack of regard for the safety of others, it will justify the presumption of wilfulness and wantonness. *Bernier v. Illinois Cent. R. Co.*, 296 Ill. 464; *Lake Shore & M. S. Ry. Co. v. Bodemer*, 139 Ill. 596; *Heidenreich v. Bremner*, 260 Ill. 439. It is the duty of this court to affirm this judgment as far as the evidence is concerned unless we can say that the verdict is manifestly against the weight of the evidence. *Donelson v. East St. Louis & S. R. Co.*, 235 Ill. 625; *Heide v. Schubert*, 166 Ill. App. 586.

We have carefully read the evidence and have given

due consideration to all of the facts urged on both sides. The declaration alleges that there was no shade near the stock house and that the building was very dusty and dirty owing to the nature of the business carried on therein; that owing to the fact that appellant was accustomed to do no switching or moving of cars on number 6 track during the noon hour, it had been customary for a period of two months prior to the accident for certain employees to sit under the cars on track 6 in the shade and eat their lunch; that appellant had knowledge of these facts, or had a reasonable opportunity to have knowledge thereof. In support of these allegations appellee offered to prove that it was not customary for switching to be done at the noon hour, and that the men had been in the habit of sitting under the cars at the noon hour for some time prior to the accident. Appellant's objection to this proof was sustained and the evidence was excluded. No cross errors have been assigned and for that reason the question of the competency of this proof is not before us. We mention this fact merely for the purpose of showing why these allegations of the declaration were not proven. It does appear from the evidence, however, that there was no shade around the building and that its interior was dusty and dirty. While there is some evidence on behalf of appellant tending to show that there had been switching on track 6 prior to noon, we do not think this fact is established by the preponderance of the evidence, but on the contrary we think the preponderance of the evidence shows there was no switching before noon on that day. Transau, the warehouse foreman, testified that at noon seven or eight cars were loaded and were ready to go. If they were loaded and ready to go at the noon hour then there had been no switching on track 6 prior to the noon hour. It is probably true that there had been some talk between the cement foreman and the switching crew relative to putting

244    APPELLATE COURTS OF ILLINOIS.

Snedden v. Ill. Cent. R. Co., 234 Ill. App. 234.

four empty cars on track 6, but the evidence does not show that this information was conveyed to appellee or his fellow employees. The evidence shows that usually while switching was going on the iron sheets between the loading platform and the door of the cars were removed. The preponderance of the evidence shows that those sheets were not removed before the noon hour but were knocked out of position when the cars were struck at the time appellee was injured. When the noon whistle blew most of the men got in or under the cars. Appellee was accompanied under the car by Burke, who was his boss. It is hard to understand why Burke would get under this car if he knew that switching was to begin within the next fifteen minutes, or why he should permit the other men to go under if he had such knowledge. It is conceded that the men had not been under the car to exceed fifteen minutes when the engine and two cars went south on track 7. This train was less than thirty feet away, the engineer was on the side next to track 6, with nothing to obstruct his view. Several witnesses testified they waved to him and he waved back. He testified he did not see the men, that he was standing up, looking to the south and that the west cab window was lower than his head. Notwithstanding the denial of the engineer we think the preponderance of the evidence shows he saw appellee and his companions. If he saw them he knew they were in a position of grave danger and if he went in on track 6 and bumped the cars under which they were sitting that some of them were liable to be injured. He went south about 500 feet and in a very few minutes came up on track 6 and without warning struck the car under which appellee was sitting and the injury followed. To say the least, the question as to whether or not the act was wilful and wanton was for the jury to determine. They decided it contrary to the contention of appellant. To justify this court in reversing that finding

we must hold that it is contrary to the manifest weight of the evidence. This we do not feel justified in doing, and the judgment should not be reversed because it is against the evidence.

Complaint is made that the court improperly modified the fourth, fifth and ninth instructions tendered by the appellant. The modifications are substantially alike in each instruction and the fifth will be taken as an example. As tendered, it told the jury "that unless the jury believe from a preponderance of the evidence that the defendant railroad company, through its employees, agents and servants, knew that the plaintiff was in the place of danger where he received his injury and that with full knowledge of that fact, wilfully and wantonly caused the car to be struck in such manner as to injure him, then no recovery can be had under the fourth additional count of the declaration." The court modified it to read "that unless the jury believe from a preponderance of the evidence that the defendant railroad company, through its employees, agents and servants, knew that certain employees of the Chicago Portland Cement Company, among whom was the plaintiff, were in the place of danger," etc. The court merely added the words, "certain employees of the Chicago Portland Cement Company, among whom was." As we understand appellant's objection to these modifications it is that the declaration alleged that appellant had knowledge that appellee was under the car; that this allegation must be established by the preponderance of the evidence and appellant had the right to have the jury instructed in the original language of the fifth instruction. There are several answers to this contention. The first one is that the declaration not only alleged that appellant had knowledge that appellee was under the car, but it also alleged that appellant had knowledge that several men, including appellee, were under the car. This allegation appears in several places in

the declaration. The modification of the instructions is therefore in accordance with allegations of the declaration. Furthermore, we are unable to see that the modification in any material respect changed the meaning of the instructions as originally drawn. It certainly cannot be claimed that it was modified to such an extent as to constitute reversible error. The third instruction given on behalf of appellant contains substantially the same language as was used in the modification of the three instructions complained of. Where appellant uses substantially the same language in an instruction given on its behalf, appellant ought not to complain that the court adopted practically the same language as used by appellant. We do not think there was any error in the modification of the fourth, fifth and ninth instructions.

The sixth instruction as submitted by appellant told the jury "that the tracks in question were the property of appellant." It then told the jury that unless the evidence showed that appellant knew that appellee was under the car there could be no recovery. The court struck out the latter part of the instruction and this is assigned as error. The instruction as originally offered covered two separate and distinct propositions and should have been contained in two separate instructions. The part stricken out was covered by several other instructions given so there was no error in its modification, and the part given was correct. Complaint is made of the refusal of the court to give the twenty-first, twenty-second and twenty-third instructions offered by appellant. The first two were covered by the fourth, fifth and ninth given. The last one was not relative to the issues in the case. There was no error in refusing any of them.

Appellant next insists that the court erred in overruling the motion in arrest of judgment for the reason that the declaration did not allege wilful and wanton negligence. In support of this position it is con-

tended that there is no allegation that the striking of the end car would move the car under which the men were sitting; that the relation of the end car to the car under which the appellee was sitting is not stated in the declaration; that the declaration merely avers that the appellant wilfully and wantonly struck the end car; that this is nothing more than the allegation that it intended to strike that car, and the intention to strike a car is not wilful and wanton negligence; that the declaration failed to allege that the servants of appellant knew or ought to have known that the probable consequence of the striking of the end car would be to injure some one sitting under the car at the platform.

The declaration alleged the facts relative to loading the car, the custom of not switching or moving cars on that track during the noon hour; that it was the duty of appellant not to move suddenly and without warning the car under which appellant knew appellee and other men were sitting; that "said servants in charge of said locomotive and moving cars, then and there wilfully and wantonly failed to comply with its said duty in that behalf, heretofore alleged, but, on the contrary, the plaintiff avers, then and there the defendant, by its said servants in charge of said locomotive and moving cars, wilfully and wantonly drove said locomotive and moving cars with great force and violence against the end car of said string of standing cars, and thereby set in motion said string of standing cars, including the said car under which the said servants of the defendant, or certain of them then and there in charge of said locomotive and moving cars, then knew there were several men, including plaintiff, as heretofore alleged, thereby setting said last-mentioned car in motion, at an unusual time, as heretofore averred, and without reasonable warning to said men, including the plaintiff, then and there under said car." It further alleged that "by reason of said wil-

ful and wanton act of the defendant, as heretofore averred, and as the result thereof, the plaintiff then and there sustained the following injuries,'' etc. The instructions submitted by appellant were in accordance with the facts as alleged in the declaration. The case was tried upon the theory that the declaration stated a cause of action for wilful and wanton negligence. The declaration did state a good cause of action. We do not think the declaration is capable of the interpretation sought to be placed upon it by the appellant. It was sufficient to sustain the verdict and the court committed no error in overruling the motion in arrest of judgment.

It is next urged that the damages are excessive. It must be admitted that these damages are large. It must be remembered, however, that the action was not only based upon the fact that the appellee lost his right arm and sustained serious and permanent injuries, but that these injuries were wilfully and wantonly inflicted. The appellee was, therefore, not only entitled to actual damages sustained, but he was also entitled to exemplary damages. *Consolidated Coal Co. v. Haenni*, 146 Ill. 628. The amount which may be recovered as damages under circumstances such as appear in this record is a question of fact for the jury in the first instance but is subject to review by this court. *Chicago Consol. Traction Co. v. Mahoney*, 230 Ill. 562. In reviewing the question as to whether these damages are excessive we are to be governed to some extent by the amounts of damages which have been sustained in other cases. In *Chicago City Ry. Co. v. Wilcox*, 33 Ill. App. 450, in *Chicago & G. T. Ry. Co. v. Spurney*, 97 Ill. App. 570, and in *Chicago, B. & Q. R. Co. v. Dunn*, 106 Ill. App. 194, damages in the sum of $15,000 were sustained for the loss of a leg. In *Davidson v. Montgomery Ward & Co.*, 171 Ill. App. 355, $35,000 damages were sustained for the loss of a right arm and for other injuries. In *Hayes v. Wabash R.*

*Co.,* 180 Ill. App. 511, $14,000 damages were sustained for the loss of an arm. In *Fillippi v. Spring Valley Coal Co.,* 202 Ill. App. 61, $18,500 damages were sustained for the loss of a leg. In *Wilson v. Chicago Heights Terminal Transfer R. Co.,* 212 Ill. App. 271, $18,725.51 damages were sustained for the loss of a leg. In *Lerctte v. Davis,* 225 Ill. App. 93, 306 Ill. 348, $18,000 damages were sustained for the loss of a leg. In *Roeder v. Erie R. Co.,* 164 N. Y. Supp. 167, $32,500 damages were sustained for the loss of an arm. In *Standard Oil Co. v. Titus,* 187 Ky. 560, $15,200 damages were sustained. It is true that each of these cases depends upon its particular facts. There is no fixed amount that can be allowed as just compensation in all cases. The cases cited merely show that amounts larger and smaller than this have been sustained. In some of them, it is true, that there were certain facts which may have made the amount of the judgments quite large. In this case, the appellee was a boy only fifteen years of age, he lost his right arm, and he complained that even at the time of the trial it caused him some pain and trouble. In many of the cases cited, the court has recognized the fact that the purchasing power of money has decreased within the last few years, and that a judgment of this size is not as much as it was a few years ago. *Posch v. Chicago Rys. Co.,* 221 Ill. App. 241; *Hurst v. Chicago, B. & Q. R. Co.,* 280 Mo. 566. After a careful examination of all the facts, we have reached the conclusion that we would not be justified in reversing the judgment solely upon the ground that it is alleged to be excessive.

The appellant insists that the trial court in passing upon the motion for a new trial refused to review the evidence but left that task to this court. In support of this contention a remark made by the court at the time he passed upon the motion for a new trial is called to our attention. We do not attach very much significance to the statement made by the court at

that time. The court overruled the motion for a new trial, entered judgment on the verdict and signed the bill of exceptions. In so doing it was necessary to pass on the evidence and the court by these acts in effect held that the evidence sustained the verdict and that appellee was entitled to judgment.

We find no reversible error, and the judgment will be affirmed.

*Judgment affirmed.*