## WINEGAR v. OREGON SHORT LINE R. CO.

No. 4941. Decided May 5, 1931. (298 P. 948.)

Geo. H. Smith, J. V. Lyle, R. B. Porter, and W. Hal Farr, all of Salt Lake City, for appellant.

Willard Hanson and A. H. Hougaard, both of Salt Lake City, for respondent.

EPHRAIM HANSON, J.

Plaintiff brought an action against defendant, under the Federal Employers' Liability Act (45 USCA §§ 51-59) to recover damages for personal injuries alleged to have been caused by defendant's negligence. From a verdict and judgment in favor of the plaintiff, the defendant appeals.

The plaintiff was employed as a car checker and inspector. The occasion on which he sustained the injuries of which

complaint is made he was performing the duties of car checker. He was working in conjunction with three other employees, two of whom were inspectors and the other was a repair man. Their shift began at 11:30 p. m., and continued for eight hours. Each was required to carry a lantern, and the respondent was also obliged to carry a clip board by which he held his record in place. As a checker he was required to write down the name of the train; the date and exact time of its arrival, the time it was blue-flagged, the number and the kind of car being inspected, whether it was empty or loaded, and in addition thereto he wrote down whatever defects and impairments which the inspectors called out to him, one of whom was on each side of the car. If the impairments were such that it could not be repaired by them, it was noted as a "bad order." He would have to do this writing as he went along. He wrote his own explanation of the information called out to him by the inspectors. To do this it was necessary for him to have his attention on his work.

In the defendant's yard, in addition to the two through tracks, there were ten or more parallel switch tracks, branching off the main lead and running approximately north and south. The train on which the plaintiff and his associates were working on the occasion in question was an interstate train known as the Denver-Pacific. This is a fast freight, and it is designated in the evidence as a "manifest train." The "manifest trains" are given preference over the dead freight. It is required that such a train be inspected, checked, and repaired with as much rapidity as possible and sent on its course. If the cargo of any of its cars is billed to this point, that car must be transferred to its consignee without any unnecessary delay. On these manifest trains the inspection work is ordinarily done at the rate of a car per minute. The Denver-Pacific is a daily train. It comes in during the plaintiff's shift. There are four other manifest trains similar to the Denver-Pacific.

On the day of the accident, the Denver-Pacific came·in on track No. 5. As soon as it was stopped, the road engine was cut off and the train blue-flagged. At night a blue lantern is used in addition to the flag. The blue light can be seen for a distance of 300 to 500 feet. When a train is blue-flagged, that is notice that there are men working around it, and it is not to be molested so long as the blue flag remains. The switchmen are notified when a train is turned over to the carmen for inspection and repairs, and of the track on which the train is placed. On this occasion the plaintiff and his crew began the inspection at the head of the train and worked north with the main lead at their back. When he was checking the third car, the switching crew shunted or kicked a cut of two empty gondola coal cars in on track No. 6 adjoining the track on which the Denver-Pacific train had been placed and on which plaintiff was at work, without giving any warning or notice of any kind to the plaintiff or the members of his crew of the approach of the cars. The plaintiff was struck by one of the cars and injured.

In the complaint it is alleged that it was the "custom, practice and usage" in the switchyard of the defendant that, whenever a crew of men were engaged in inspecting, checking, and repairing a string of cars on one of the switch tracks, no car or cars would be run in on an adjoining track without notice or warning thereof to the employees so engaged; that for a long time prior to the accident here in question the members of the switching crew had always notified and given warning to the employees so engaged of the approach of a car or cars on an adjoining track; that the plaintiff on the occasion in question relied upon such custom and practice, and especially did he rely on the fact that, if and when any cars were to be run in on a track adjoining the one on which the Denver-Pacific train had been placed for checking, inspection, and repairs, the defendant's employees whose duty it was to perform the switching operations, would know or with reasonable care

should know, that the plaintiff and other employees were then engaged in checking, inspecting and repairing the cars making up the train, and that he and such other employees so engaged would be given notice and warning of the approach of such car or cars coming in on an adjoining track.

The defendant answered denying the existence of the custom, practice, or usage asserted by the plaintiff, and also pleaded contributory negligence and assumption of risk as a defense to the plaintiff's alleged cause of action.

At the conclusion of the plaintiff's case the defendant moved for a nonsuit, which motion was denied; on the submission of the cause it moved the court for a direction of a verdict in its favor. This motion was also denied. Exceptions to these rulings were duly taken, and the only errors relied on by the defendant challenge the correctness of these rulings. We observe no motion for a new trial was made.

The fundamental errors complained of by these assignments, as gathered from the defendant's brief, is that the court in each instance declined to rule that there is no evidence to show that the defendant was guilty of any negligence and that the chance of such an accident as happened is one of the risks that the plaintiff assumed by reason of his employment. Instead of that, the court submitted the case to the jury on the plaintiff's theory as alleged in his complaint. The only negligence charged is predicated on the failure to give the usual and ordinary notice required by the switching practice and custom followed in the defendant's yard as pleaded by the plaintiff. There is no suggestion that any such notice was given; therefore the existence of such a custom or practice was the controlling question of fact at the trial. On this appeal, therefore, the sole question is whether the evidence, in respect of such custom and practice, resolved most favorably to the plaintiff, is sufficient to sustain the verdict.

The plaintiff himself, who had been employed in defendant's service for five years, the two years next preceding

the accident, was a car inspector or checker, and Frank Redford, Jr., a man of family, and who up to the time of the injury had been in the defendant's service for eighteen months as a car checker, and at the time of the trial was still so employed, both testified that such a practice existed in the defendant's yard. Their testimony was to the effect that, whenever the members of the inspection crew were working in close proximity to the main lead, it was the custom for some member of the switching crew to give them some warning when cars were being kicked or run in on an adjoining switch track. This warning was given by shouting or by whistling. The plaintiff, when asked how the switchman would give the warning, testified: "Various ways, sometimes whistle to you, sometimes call out 'Look out, cars coming in on No. 6,' or call our attention in various ways—any way to call our attention." These witnesses explained in their testimony, and this evidence finds some support in the testimony of some of the defendant's witnesses, that the switching crew worked along the main lead practically all the time; that the noise caused by the operation of the switch engine in the ringing of the bell, blowing of the whistle, and by the escaping steam, and in the movements of the engine and cars required in the various switching operations, rendered it very difficult, if not impossible, while at work close to and near the main lead, to hear and to recognize the sound of a car coming in on an adjoining track on its own momentum, but as the inspection crew, in the progress of the work, moved some distance away from the main lead, the noise and confusion of sound grew less, so that the sound of an approaching car on an adjoining track became more distinct and localized, and was therefore generally sufficient in and of itself to attract the attention of the members of the crew. Plaintiff testified that he had always been notified by some member of the switching crew so long as he was within calling distance from the point on the main lead at which the switch is thrown. When he was

injured he was checking the third car, and was about 250 feet from the switch controlling No. 6 track.

The witness Redman testified that, when the crew to which he belonged was working in the vicinity of the main lead and at the point where the plaintiff was injured, they had to depend on the switchman calling their attention that cars were coming down the adjoining track.

There were fifteen witnesses who testified for the defendant. All of them testified that there was no such custom or practice prevailing in the defendant's yard; that each employee was required to take care of himself. These witnesses included the general yardmaster and his assistant, the engine foreman, and switchmen whose duty it was in the switching operations to throw the switch. There were also yard checkers and two car inspectors. Some of the witnesses who were and others who had been switchmen, or engine foremen, testified that they had never given such a warning, and neither did they know of such a warning having ever been given by any one else; one or two others testified that they had occasionally given such a warning, but that it was not regularly or ordinarily done. The engine foreman and switchmen testified that frequently cars would be running in on two or more leads at the same time, and that in the performance of such an operation the employee throwing the switch would not have the time to look for or to warn the employees engaged in checking, inspecting, or repairing cars, and that many times cars would go down tracks previously lined up and where there would be no switchman at the time, so that it would be impossible to give any notice.

Much of the testimony in behalf of the defendant relates to switching operations in the yard generally. It is not confined to the situation where a cut of cars is shunted or run in on a lead adjoining a string of cars on a train protected by a blue flag. The plaintiff's position in this respect is that the custom and practice in question is uniformly followed only when cars are being shunted in on a

switch track next to a train or string of cars that are blue-flagged and on which the car inspectors are at work, and then only when the members of the inspection crew are within calling distance from the point on the main lead at which the switch is thrown to permit of cars coming in on the adjoining switch line. The gang foreman on this same shift, called in behalf of the defendant, testified that the car checkers, the inspectors, and the repair men always worked under a blue flag. We have already stated that the switching crew were notified when a train had been turned over to the car inspectors and checker, and of the track on which it was placed.

Counsel for the defendant, by the authorities cited in that connection, insist that it was incumbent on the plaintiff to show such a custom or usage which has obtained the force of law. With this view we do not concur. It is quite uniformly held, in actions by a servant against █ his master that the servant has the right to rely on wranings and signals customarily given in the conduct of the business, and if the master fails to give these he is guilty of negligence. 39 C. J. 458, § 573; *St. Louis & S. F. Ry. Co.* v. *Jeffries* (C. C. A.) 276 F. 73; *Chicago, M. & St. P. Ry. Co.* v. *Dutcher* (C. C. A.) 182 F. 494; *Lake Erie & W. R. Co.* v. *Molloy,* 78 Ind. App. 72, 134 N. E. 913; *Anderson* v. *Northern Mill Co.,* 42 Minn. 424, 44 N. W. 315; *Andreson* v. *Ogden Union R. & D. Co.,* 8 Utah 128, 30 P. 305; *Fritz* v. *Western Union Tel. Co.,* 25 Utah 263, 71 P. 209; *Dutrey* v. *Philadelphia & Ry. Co.,* 265 Pa. 215, 108 A. 620.

It is also urged in behalf of the defendant that the custom is not uniform or reasonable. The reason assigned for this assertion we quote from the defendant's brief:

"That if there was a custom it must extend the full length of the track and not to that distance that a switchman felt his voice would carry. If the plaintiff was entitled to rely upon the railroad protecting him on the end of the track, he was entitled to the same kind of protection as long as he was working on the track."

A sufficient answer to this argument is that there is no contention or claim made that any notice was ever given unless the inspection crew was within calling distance of the switch stand on the main lead. It is not contended that the practice of giving notice extended beyond calling distance from the main lead. When we resolve the evidence most favorably in favor of the plaintiff, as we must do on this appeal, it must be obvious from the facts we have set out that there is no justification for the conclusion urged by the defendant that, if notice were given near the lead, the employees would be entitled to such notice for the entire length of the line. There is substantial evidence tending to show that near the lead the noise is so great and confused that it is difficult, if not impossible, to detect a cut of cars shoved in on an adjoining switch track, but, as the inspection crew works away from the lead, the noise is less confused, and the sound of the cars as they come in grows more distinct and noticeable, so that the noise which the cars makes becomes sufficient of itself to attract the attention of the members of the crew. There is direct and positive evidence that such notice had been given for a long time and that when near the lead the plaintiff relied on being warned when cars were shoved in on an adjoining track.

Counsel for defendant, referring to the number of witnesses called in defendant's behalf, argues: "There could of necessity be no custom here in the matter of switching cars unless such custom was known by the switchmen and acted upon by them. A custom could not be made or established by one or two employees when all the other employees knew nothing about it."

We see no objection to this as a statement of substantive law, but it certainly cannot be seriously urged that the testimony of the switchmen and engine foremen must be taken as conclusive as to the fact of whether they did or did not know of such a practice, or whether they had or had not given such notice or warning. The jury was not

obliged to believe the witnesses for the defendant as against substantial evidence in behalf of the plaintiff of the existence of the alleged practice. It is obvious that the jury believed the testimony of the plaintiff and his witness in respect to such custom and practice, as it was within its power to do.

A very similar situation, and one involving the identical question on principal, was before the Circuit Court of Appeals, Eighth Circuit, in the case of *St. Louis & S. F. Ry. Co.* v. *Jeffries,* 276 F. 73. Two or three witnesses for the plaintiff testified that there was such a custom, while six or seven witnesses for the defendant testified that there was not. It was urged by defendant that there was absolutely no evidence to disprove the positive testimony of some of the defendant's witnesses who stated they had not observed any such custom; therefore it was further urged there was uncontradicted evidence that the custom of which plaintiff's witnesses testified was not uniform, and hence not binding, thereby making the existence of the custom a question of law.

The court held that such a position would render it impossible to ever establish a custom if some witness whose orthodoxy in telling the truth would permit him to deny that there was such a custom as claimed, for, if the proposition is sound, it must be just as sound with one witness as seven. Because certain witnesses testified they had not observed any custom, it cannot be maintained that there is uncontradicted evidence that the custom was not uniform, in view of the testimony of the plaintiff and his witnesses in that respect. We think this case is controlling on the question before us.

We have carefully examined all cases relied upon by defendant, and we think none of these are opposite to defendant's contention. With the exception of two cases, the question of a custom or practice was not ■ in issue. As a rule, a local custom or practice as was here involved is a fact which **must be averred and proved**

in the same manner as any other material fact connected with the subject of litigation. *Simms* v. *Sullivan,* 100 Or. 487, 198 P. 240, 15 A. L. R. 678.

The existence of the practice to give warning to car inspectors was an issue in the present case. There was a conflict in the evidence, and the issue was determined solely on the weight and credibility of the testimony. The case was properly submitted to the jury. Under the facts, its verdict is conclusive upon us.

Judgment affirmed; costs to respondent.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.