(No. 6165.   April 30, 1935.)

CHARLES HANSEN, Respondent, v. STANDARD OIL
    COMPANY OF CALIFORNIA, a Corporation, and
    C. R. NELSON, Appellants.

[44 Pac. (2d) 709.]

Paris Martin, for Appellants.

Walters, Parry & Thoman, for Respondent.

GIVENS, C. J.—Appellant Standard Oil Co., prior to August 20, 1932, sold to Dr. C. W. Dill in Shoshone two underground gasoline tanks to be used in connection with a service station being erected by the doctor, the tank in question herein being about four feet in diameter and seven feet long. After the tanks were delivered and lying on the ground near where the service station was being constructed, Thomas, employed by Dr. Dill in digging the pit for the tanks and assisting in the erection and preparation of the service station, discovered a small crack some two or three inches long and about one-half inch wide near the end of one of the tanks. He notified Dr. Dill, who communicated with the company, which sent Mr. C. R. Nelson, district manager of the territory including Shoshone, and Mr. Boehm, then a salesman for the company from Twin Falls, who employed respondent to repair the tank by welding. The tank was a second-hand tank containing a small amount of gasoline and fumes which, when respondent applied his acetylene torch, exploded, burning approximately one-third of the surface of his body and head and breaking his left leg, for which he sought and recovered in this action damages in the sum of $23,100.

Various assignments of error bring up the first and most important point in the case involving the defense of contributory negligence which appellants contend so conclusively appears from the record that a nonsuit or directed verdict should have been given.

Appellants concede that the testimony most favorable to respondent and all reasonable inferences to be drawn therefrom affords the basis for the consideration of this question, and that all evidence contradictory thereof under the rule

is to be disregarded; they thus concede that we may approach the problem on the assumption that neither Nelson, Boehm nor anyone else told respondent the tank was a used one and had not been prepared by steaming or having been filled with water or that respondent in fact knew such to be its condition. (Though there was evidence to the contrary.) It is likewise conceded by respondent that he did not ask or investigate as to the previous or present condition of the tank.

What respondent knew or should have known from the appearance of the tank and all other circumstances bearing upon this situation are best presented by the following paraphrased narrative of respondent's own testimony:

### (Direct Examination.)

"Not generally in the welding business, had it (welding outfit) for use in my own business, had practiced it (welding) since 1912 (accident 1932) did mechanical work in aviation during war and superintended same. Noticed two tanks, Nelson and Boehm asked if I could weld tanks, showed me crack, two or three inches long, barely visible, filler pipe three inches in diameter screwed in close by. Didn't tell me what had been put in tank, no one else told me. Thomas and Green at the time started to weld close to tank.''

### (Cross-examination.)

"Skilled garage mechanic, don't know how many gasoline tanks repaired in 25 years, learned from experience repair of gasoline tank dangerous. Didn't know this was gasoline tank. Nelson told me going to use it for gasoline. Didn't tell me it had been used or that it had gasoline in it, found out after explosion. Thomas told me afterwards he knew gasoline in it and that Standard Oil Co. and Nelson knew it. Knew explosive power of gasoline and tank looked like gasoline tank. Didn't inquire, didn't smell, didn't tilt, didn't observe clay on tank, observed service pipe screwed on. Saw nothing to indicate tank had been in ground. Made no observation. Didn't observe to see if gasoline in it. Crack

didn't indicate. Could have easily asked. Never noticed if water 20 or 25 feet away. Wouldn't have bothered with tank if I had known gasoline in it. Could not have filled it with water, not customary method of repairing, could have used one of usual and several methods to make tank safe for repairs. Nelson and Boehm left the matter entirely in my hands, they didn't claim to exercise control as to how to repair. As a skilled mechanic I knew customary way of making repairs on a gasoline tank, generally steamed and then filled with water, didn't steam it, didn't ask if it had ever had gasoline in it.''

(Redirect Examination.)

''Never welded underground tank like this before. If it had been new, safe to weld it as I did. But companies generally prepare tanks before they bring them to be welded. I relied on it either being a prepared tank or a new tank. I relied on instructions of Nelson and Boehm.''

(Recross-examination.)   ·

''Knew there was custom of oil companies to prepare a used tank before bringing them for repair, didn't ask if new or old. Asked to weld a Continental Oil Co. tank and refused because I knew gasoline in it, knew dangerous to weld unless prepared.''

The question, therefore, is whether the above evidence so conclusively shows contributory negligence on the part of respondent that as a matter of law he cannot recover, or whether reasonable minds might differ as to the proper conclusions to be drawn therefrom. (*Pilmer v. Boise Traction Co.*, 14 Ida. 327, at 338, 94 Pac. 432, 125 Am. St. 161, 15 L. R. A., N. S., 254), considering respondent was bailee and appellants bailors. (*King v. National Oil Co.*, 81 Mo. App. 155.)

We need not decide whether from the appearance of the tank the respondent should have known it was a second-hand tank, containing at one time gasoline, and that if nothing more appeared, his failure to ask or investigate would

have constituted contributory negligence as a matter of law, because he testified he understood it was the custom for oil companies such as appellant to properly prepare a used tank and make it safe for welding before having such an operation performed. Respondent testified on both direct and cross examination that there was such a custom.

" . . . .

Q. "Did you know anything about the custom of oil companies in preparing tanks for repair after they had been used?"

Mr. Martin: "Object as incompetent, irrelevant and immaterial; that is new matter, just an attempt to bring it out in redirect."

The Court: "Well, he may answer 'yes' or 'no.'"

A. "Yes."

Q. "What is the custom?"

Mr. Martin: "Object as incompetent, irrelevant and immaterial; a new subject brought out on redirect that wasn't touched upon."

Mr. Parry: "I will ask permission to ask it as a part of the direct, to re-open."

The Court: "Very well, objection overruled."

A. "They generally prepare them before they bring them to a party to have them welded."

Q. "How do you know?"

A. "Steam them and remove all the gasoline fumes."

(Recross-examination.)

Q. "Did you know there was some custom, as you claim, of oil companies to prepare a used tank before bringing them for repair, at the time this happened?"

A. "Yes sir."

Q. "You didn't ask Mr. Boehm or Mr. Nelson whether they had steamed this tank or filled it with water?"

A. "No sir."

Q. "You didn't ask them whether it was a new tank or an old tank?"

A. "No sir."

Q. "Now you say there is a custom for these oil companies to steam these tanks or fill them with water; what particular tank or particular incident do you know that happened where the company prepared it?"

A. "I was asked to weld one for the Continental Oil Co. and refused because I knew it had gas in it and they sent their man from Salt Lake and told me never to touch one until it had been prepared."

Q. "When was that?"

A. "Two or three years ago."

Q. "What other incident do you know of?"

A. "That is the only one."

Q. "So you did know that to weld a tank was dangerous unless it was prepared?"

A. "Yes sir."

Appellant argues that:

"It was not alleged or proved by plaintiff that there was a custom on the part of oil companies or persons having a gasoline tank to repair, to prepare a used tank for repairs by running it full of water or steaming it or in any other manner before presenting it for repairs to a mechanic. In the absence of an allegation in the complaint to that effect and proof supporting it, logic and plain common sense would support the view that it would be the duty of a skilled mechanic to prepare a used gasoline tank for repairs before attempting to weld it with a flaming torch."

Such argument overlooks the fact that no objection was made to the questions as to custom on the ground that there was no allegation to support them, that respondent was cross-examined with regard thereto and that this issue was tendered and considered before the trial court as bearing on the merits of the case, and is so argued here by appellant in its main and reply brief, and respondent alleged, paragraph IV of the complaint,

(" . . . . that the defendants carelessly and negligently failed to remove all of the gasoline and gasoline fumes from said tank before engaging the plaintiff to weld the same; . . . . ")

and there was proof offered that respondent relied on appellant's compliance with a custom of such companies to prepare tanks so they would be safe. The answer does not specifically deny that it was not negligence not to have prepared the tank but avoids such allegation by alleging respondent contracted to prepare the tank, which was denied by respondent. Hence this feature of the matter is properly in the case. (*Weed v. Idaho Copper Co.,* 51 Ida. 737, at p. 753, 10 Pac. (2d) 613.)

It is apparent that the word "custom" was used not in a technical sense, as meaning a custom rising to the dignity of law, but rather usage and the way of doing particular things, the legitimacy and pertinency of which has been recognized and sanctioned quite generally as negativing contributory negligence. Thompson on Negligence, vol. 1, sec. 30; 17 C. J. 446, 447, wherein reference is made to *Fritz v. Western Union Tel. Co.,* 25 Utah, 263, 71 Pac. 209, which case as to this feature is quite pertinent and enlightening, the court saying at page 213:

"Appellants further complain that error was committed in permitting witnesses to answer as to the ordinary and usual method existing among telegraph or telephone companies in regard to providing insulators, and as to the number of wires that should be strung at any one time. The reason assigned for appellants' objection is that it is an improper and insufficient manner to prove the existence of a custom in this respect. We do not think that either the questions or answers objected to contained anything which even tended to show a purpose upon the part of respondent to prove the existence of any custom, or to bind the defendants by its existence. While it is true that the word 'usage,' 'usual,' 'custom,' or 'ordinary,' is used, yet it is quite apparent that the only object of the inquiry was to inform the jury as to the ordinary manner in which such work is performed, and from such testimony determine whether or not defendants were or were not guilty of negligence. The case of *Nelson v. Southern Pac. Co.,* 15 Utah, 325, 49 Pac. 644, cited by appellants does not affect this case at all.

That was a case where it was sought to prove an existing custom which would excuse an ordinarily negligent act; and, under those circumstances, it was held by this court that the existence of the custom at the time of the accident must be shown to have existed such a length of time as to become generally known, and must be reasonable, uniform, certain, and not contrary to law. But in this case it is not a question as to any custom existing permitting employees to act negligently, or as to the construction of any appliances, or in fact to any custom, in a legal, technical sense. As we conceive it, it is simply an inquiry as to the ordinary manner in which certain work is done, and we have been cited to no case where such testimony has been held inadmissible, but, on the contrary, courts have held that testimony tending to show that the customary manner of doing certain work (for instance, that a lineman was to determine for himself the safety of poles) was perfectly proper. *Tracy v. Telegraph Co.,* (C. C.) 110 Fed. 103. So it has been held proper to testify as to the usual and customary time allowed at any station, not for the purpose of establishing any hard and fast rule as to the custom, but merely bearing upon the question as to whether or not a reasonable time was allowed to enable passengers to safely leave a train. *Fuller v. Naugatuck Ry. Co.,* 21 Conn. 557.''

See, also, *Pence v. California Min. Co.,* 27 Utah, 378, 75 Pac. 934, at p. 937; *Winegar v. Oregon Short Line Ry. Co.,* 77 Utah, 594, 298 Pac. 948, at p. 851; *Myrtle Point Transp. Co. v. Port of Coquille,* 86 Or. 311, 168 Pac. 625, at p. 627; *Lawrence v. Portland Ry., Light & Power Co.,* 91 Or. 559, 179 Pac. 485, at p. 486; Thompson on Negligence, vol. 1, sec. 30; *William Laurie Co. v. McCullough,* 174 Ind. 477, 90 N. E. 1014, 92 N. E. 337, Ann. Cas. 1913A, 49; *Davidson v. Toledo Home Telephone Co.,* 5 Ohio App. 237; *Schaffner v. National Supply Co.,* 80 W. Va. 111, 92 S. E. 580; *Fowler v. Chicago Rys. Co.,* 285 Ill. 196, 120 N. E. 635, at p. 637; *Culbertson v. Kiechefer Container Co.,* 197 Wis. 349, 222 N. W. 249, at p. 251; *Young v. American Express Co.,* 76 N. H. 582, 86 Atl. 138; *Diehl v. Lehigh Valley R. Co.,* 254

Pa. 404, 98 Atl. 1061; *O'Connor v. Powling & Hernisch-feger Co.*, 191 Wis. 323, 210 N. W. 696.

■ Appellants' argument that:

"When plaintiff was in the presence of known and obvious danger, whether or not he was warned by appellants is immaterial. So, it is not a material fact in this case whether or not defendants told plaintiff to fill the tank with water before attempting to repair it, when plaintiff testified and admitted that he had been warned two years before never to touch one unless it had been prepared and that he knew the danger of repairing a used gasoline tank and did not look or inquire."

is met with respondent's testimony to the effect that he did not know the tank had not been cleaned and contained gasoline fumes at the time, and it is not disputed that the tank had not been cleaned.

No evidence was introduced to indicate to respondent that appellant had not cleaned the inside of the tank, except the testimony of Frank Crandell, who testified that he frequently passed the tank and when he had occasion to go pretty close to it one day he smelled gasoline at one of the nozzles. It still remained, however, a question for the jury to say whether respondent could or should have detected such odor and whether that indicated or should have indicated that the tank had not been sufficiently cleaned, and so remained dangerous. (*Fuchs v. Kansas City Southern Ry. Co.*, 132 La. 782, 61 So. 790, at p. 793.)

■ Appellant argues as follows:

"If I take a gun in to an experienced gunsmith to have it repaired, it makes no difference whether it is a new gun or old one. Admit that nothing is said about whether it is new or old or has ever had cartridges in it. It is true, I suppose, I would be negligent in taking a loaded gun to a mechanic without warning him that it was loaded. But we will admit that I was negligent in doing so. I leave the gun there under the control and in the custody of the gunsmith and I exercise no control over him whatever as to how he

shall repair it. Now, if there was something wrong with the firing pin and he thought that he could fix it by striking the hammer a blow, and stood in front of the barrel while doing so, and without first looking, and admittedly not having inquired as to whether the gun was loaded or not, would he be considered a prudent mechanic? Clearly the answer is that he would not. The negligence or wrong is his own. It happened separately and apart and after my act of negligence and was the or a proximate cause of his injury.''

While one swallow does not make a summer and one authority does not necessarily prove a point, and we recognize that decisions may be found supporting many divergent views, the following authority is at least pertinent as indicating that a reputable court considered the opposite of appellant's argument sufficient basis for a decision.

In an action for personal injuries occasioned to the plaintiff, while in the defendant's employ as an assembler of revolvers, by the explosion of a cartridge which had been accidentally left in one of the chambers of a revolver by the defendant, whose business it was to test the revolvers after the plaintiff had put them together, and, if they did not work well, to return them to him, and who told the plaintiff, when he first went to work, that he would see that no unexploded cartridge was left in the revolvers, it cannot be said, as matter of law, that the plaintiff should have examined the chambers of the revolver to see whether they contained an unexploded cartridge; or that, by continuing in the defendant's employ after finding, on a former occasion, an unexploded cartridge in a revolver returned to him by the defendant after testing it, he assumed the risk of an accident from such a cause; or that the manner in which the accident occurred showed that the plaintiff was careless; or that he should have used the safety catch on the revolver, the use of which would have prevented the accident; but all of these questions are for the jury.'' (*Anderson v. Duckworth,* 162 Mass. 251, 38 N. E. 510.)

Considering the right to rely on a custom not as matter of law but as a way of doing things and as bearing on the

question of contributory negligence, there are two stages, first, was there a custom or usage or general course of conduct for oil companies to clean tanks before having them repaired, and if there was, second, was it acting like a reasonably prudent man for respondent to rely on such custom. First as to the question of fact, plaintiff so testified without objection and was not contradicted, and second, whether reliance was justifiable or not, was for the jury. (45 C. J. 706, 954; *McArthur v. Dutee W. Flint Oil Co.*, 50 R. I. 226, 146 Atl. 484; *American Oil Co. v. Frederick*, 47 Fed. (2d) 54.) The custom or usage so relied on herein was not so dangerous as to be rejected as matter of law, as in *Rumpel v. Oregon Short Line Ry. Co.*, 4 Ida. 13, 35 Pac. 700, 22 L. R. A. 725.

Under the circumstances of this case there was sufficient evidence to present a jury question in connection with the defense of contributory negligence. (17 C. J. 518; *Carr v. Wallace Laundry Co.*, 31 Ida. 266, 170 Pac. 107; *American Oil Co. v. Wells*, 164 Md. 422, 165 Atl. 298; *Snipps v. Minneapolis & St. L. R. Co.*, 164 Iowa, 530, 146 N. W. 469.)

■ Appellant's contention that:

"Plaintiff's act in putting a flaming torch in close contact with the tank *which he knew* contained gasoline fumes, was the proximate cause of the injury."

overlooks the testimony of respondent that he did not know the tank contained gasoline fumes and that the jury had a right to believe respondent's testimony, in which event appellant's negligence, if any, could be considered the proximate cause. (45 C. J. 909.)

■■ Paragraph VII of the complaint was as follows:

"That plaintiff is forty-four (44) years of age and prior to the said injuries was in good health, fully able-bodied and was engaged in the occupation of mechanic and garage operator; that by reason of said injuries, plaintiff was required to remain in bed about seven (7) weeks after said accident and thereafter for about six (6) more weeks required the use of crutches in order to move about; that the

plaintiff was unable to attend to his business and engage in his occupation as a mechanic for 8 months following said injuries, all to his damage in the sum of $1600.''

Appellants urged as error the overruling of their objection to the following question and the admission of the answer thereto:

Q. ''Judging from your experience with the business before and after about how much would you say the business and your income was diminished per week or per month?''

Mr. Martin: ''Object as incompetent, irrelevant and immaterial; speculative and too remote.''

The Court: ''Objection denied.''

A. ''I figured the time I was totally disabled I was out two-hundred dollars a month.''

Q. ''In connection with your business; that loss?''

A. ''Yes sir.''

Q. ''For how long a time would that be?''

A. ''Eight months.''

The allegation was with reference to plaintiff's inability to tend to his business while the question and answer had reference to his business generally, under the authorities. (4 Sutherland on Damages, 4th ed., 4694, 4723; *Johnson v. Manhattan Ry. Co.,* 52 Hun (N. Y.), 111, 4 N. Y. Supp. 848; *Singer v. Martin,* 96 Wash. 231, 164 Pac. 1105; *Lombardi v. California St. Ry. Co.,* 124 Cal. 311, 57 Pac. 66; *Perry v. Ryback,* 302 Pa. 559, 153 Atl. 770, 772; *Hendler v. Coffey,* 278 Mass. 339, 179 N. E. 801; *Walsh v. New York etc. R. Co.,* 204 N. Y. 58, 68, 97 N. E. 408, 37 L. R. A., N. S., 1137; *Weir v. Union Ry. Co.,* 188 N. Y. 416, 81 N. E. 168, 11 Ann. Cas. 43, the questions and answers were not responsive to the *allegata* quoted and it cannot be said they did not have an effect on the jury; in fact it could not be said otherwise because the verdict was for the full amount asked for in the complaint. But the amount of $1,600 may be segregated and eliminated from the verdict and judgment without impairing the remainder, hence removing all prejudice to the appellant, which is ordered herein.

■ Appellant urges that the verdict is excessive. The testimony shows that respondent was prior to the accident active and in good health, forty-four years old, a fairly skilful and prospering mechanic and operator of a garage. Respondent thus described his own condition after the accident.

"Conscious of suffering from pain, body hurt many places, body burned from waist up and leg broken, chest and arms, under arms, front of face and neck, ears, burned. Changing dressings was painful, leg fractured above and below knee, pained when moved it. Left me awful nervous, not nervous before accident, after being in bed seven weeks, could get up and around on crutches, on crutches five or six weeks, could not work at garage at first, nor when was off of crutches could I work all time, burns hadn't healed, were painful, had scars, couldn't stay one place long, hands tender, if scratched they bleed profusely, and not much strength in left hand, easy to skin the hands up, base of finger nails burned, tender to cold, easily frozen, had to keep covered, can't bend leg and no strength in it, movements hampered as a result, can't run or go up and down stairs, hard to get in or out of car, can't drive car too long, diminishes distance I can drive. Very nervous, not able to do work to speak of, can work shorter hours, tire more easily."

Antonio Vierra, a mechanic working for respondent, said:

"Knew Hansen 24 years, he can't get around, can't get under cars, can't bend down, hands bother him, has to wear gloves, hands too tender, can do just a few things as a mechanic with gloves on. He gets excited and isn't like was, blows up and walks off."

Testimony of Stanley T. Bauer, a civil engineer and a resident of Shoshone:

"Hansen is rather irritable and hard to get along with, would start a job and call in other of the boys to finish it, seemed grouchy, made a vast difference in him, is far more nervous since the accident."

Testimony of Ed Green, employed by respondent:

"Hansen can't keep up with the rest of us in work as he could before, he is nervous and leg bothers him, can't get up or around, can't climb around a car, is more nervous."

The injuries he received were without contradiction, detailed by Dr. Barrett, who attended him from the date of the accident August 20th, for eight months as follows:

"When I found Mr. Hansen, his clothes were still smoking, arms and face dreadfully burned and was swinging one leg, and crying with pain, said his leg hurt, observed a charred pungent odor of burned flesh, skin rolled up and hanging two or three inches over end of fingers. Was in condition of shock, legs cold and respiration weak and shallow. Approximately one-third of body area burned which is desperate case, second and third degree burns, arms, hands, chest except in back although burns did extend around posterior auxillary line behind, entire face, ears, neck were burned and his head wasn't burned badly although his hair was partly burned off. Had fifty-fifty chance to live. Had to use morphine as he was in such pain, he showed evidence of extreme pain, and the sedative was given because of pain and nervousness and complications to bladder, treatment of which was also painful, put splint on leg, for while then cast. Changed dressings on burns about three times a day, couldn't change all at once as it was too painful, this continued for seven weeks, and was danger of poisoning, his kidneys were affected, but have cleared up, his digestive tract was affected, could not keep food on stomach. Suffered shock to his nervous system, called traumatic neurosis or shell shock, is still suffering from it and always will, it is a permanent condition. The nervous condition is more serious as far as his life is concerned. He is suffering fifty percent disability because of shell shock. Burns would be around 10 percent permanent continuing disability. Because of burns, could not operate on knee, it is fractured. His kidney resistance is cut down, more prone to develop infection in places burned. His life expectancy shortened some."

This evidence of respondent's condition before and after the injury, the difference in his individual earning power and the severity of his injuries, under the authorities, fully justified the amount of the verdict.[1]

1 $20,000.—Man seriously injured by steam and hot water, medical expenses, $6,770. (*Caldwell v. New Jersey S. B. Co.*, 56 Barb. (N. Y.) 425.)

$20,000.—Mechanic—injured by boiler explosion—face and chest badly scalded and burned, frontal bone fractured, eyes injured, the optic nerves being partially paralyzed, mind unbalanced. (*National Ry. Co. v. Ligard*, (Tex. Civ. App.) 172 S. W. 1140.)

$18,962.88.—Man, strong and healthy, earning $100 per month, scalded, bruised and mutilated upon head, face, body, limbs, skull crushed, and *non compos mentis*. (*Alamo Dressed Beef ·Co. v. Yeargan*, 58 Tex. Civ. App. 92, 123 S. W. 721.)

$13,500.—Locomotive engineer, 45 years, strong and good health, earning $135 per month, face, hands and legs scalded and burned by steam, leg weakened and stiffened, 2 toes lost, use of arm almost destroyed, eyesight impaired, incapacitated for all active occupations. (*St. Louis Southwestern R. Co. v. Kelton*, 28 Tex. Civ. App. 137, 66 S. W. 887.)

$13,500.—Common laborer, 44 years of age, earning $1.75 per day—face and body scalded, eyes weakened, left arm broken and impaired, right leg fractured and practically useless. (*Yellow Pine Paper Mill Co. v. Lyons*, (Tex. Civ. App.) 159 S. W. 909.)

$12,000.—Boy, 14 years old, legs scalded up to crotch, skin and some flesh sloughed off, legs so permanently weakened as to preclude doing of manual labor and scar tissue may ultimately necessitate amputation. (*Kentucky Distilleries & Warehouse Co. v. Wells*, 149 Ky. 275, 148 S. W. 375.)

$10,000.—Railroad fireman, 29 years old, strong, earning $65 per month, both legs below knees, both arms, whole back and left side of body and face badly burned and scalded by steam and hot water, skin and some flesh sloughing off, leaders in left leg and arm drawn materially impairing use of same, hearing and left ear destroyed, incapacitated. (*St. Louis & S. F. R. Co. v. McClain*, 80 Tex. 85, 15 S. W. 789.)

$9,000.—Locomotive fireman, 30 years old, health good, both hand and arm badly scalded and burned, ribs broken, incapacitated to follow vocation. (*Galveston, H. & S. A. R. Co. v. Croskell*, 6 Tex. Civ. App. 160, 25 S. W. 486.)

$7,520.—Locomotive fireman, one shoulder scalded, back bruised, award includes $1,000 for mental pain and suffering, $2,000 for in-

Appellant moved for a new trial based on affidavits showing newly discovered evidence, consisting of an alleged statement made by respondent to one Claude H. Detweiler that the respondent November 1, 1932, said:

"He (Hansen) had no one to blame but himself; that he knew the gasoline tank was dangerous and was a used tank,

juries to the back and $4,500 for permanent injuries. (*Barker v. Kansas City, M. & O. R. Co.*, 88 Kan. 767, 129 Pac. 1151, 43 L. R. A., N. S., 1121.

$7,500.—Brewer, hands scalded by boiling contents of cooker and left stiff and tender. (*Schmidt v. Southwestern Brewery & Ice Co.*, 15 N. M. 232, 107 Pac. 677.

$7,500.—Railroad brakeman, young, earning $100 per month and in line for promotion, badly scalded by steam, one leg very seriously and permanently injured, much continued suffering. (*International & G. N. R. Co. v. Clark*, 59 Tex. Civ. App. 82, 125 S. W. 959.)

$7,000—Locomotive fireman, 22 years old, strong and healthy, considerably burned and scalded, ribs broken, pleura ruptured, right lung destroyed. (*Illinois C. R. Co. v. Quirey*, 28 Ky. Law Rep. 245, 89 S. W. 217.)

$6,500.—Steam-fitter's helper, 19, strong, face, neck, hands, arms, legs, badly scalded, skin and flesh cooked, permanently disabled from work. (*Winona Technical Inst. v. Stolte*, 173 Ind. 39, 89 N. E. 393.)

$6,000.—Laborer, 23, strong, scalded about head, body and arms disfigured for life, use of hands lost, disabled for manual labor. (*Ragsdale v. Illinois C. R. Co.*, 140 Ill. App. 71, 236 Ill. 175, 86 N. E. 214.)

$6,000.—Carpenter, earning $18 per week, severe scalds on face, shoulder, right side, back, eye impaired, arm useless, nervous system impaired, earning capacity diminished, medical expenses $400. (*A. Bentley & S. Co. v. Bryant*, 148 Ky. 534, 147 S. W. 402.)

$10,000.—Experienced miner, 26 years old, healthy, earning $3.50 per day, abdomen and leg severely burned, left leg numb, crooked and weak, hearing impaired, confined to bed for 5 weeks, detained from work over 2 months. (*Davis v. Holy Terror Min. Co.*, 20 S. D. 399, 107 N. W. 374.)

$25,000.—Man, 34, burns on face, head, eyes, ears, hair, neck, arms, feet, knees, fingers, horrible scars, strength impaired about 25 per cent, won't be normal, mental and nervous shock, earned $150 per month before accident. (*Powell v. Standard Oil Co.*, 168 Minn. 248, 210 N. W. 55.)

$20,000.—Man, burned by exploding coal dust, "in a permanently helpless and deplorable condition." (*Southwestern Portland Cement Co. v. Challen*, (Tex. Civ. App.) 200 S. W. 213.)

and that it should have been filled with water. Hansen further stated to me that he was of the opinion that the tank had not been in use for some time and that he had therefore figured that it was safe to take the chance of welding it without first filling it with water.''

Respondent introduced his own affidavit in which he denied making the statement and stated the following as a reason for Detweiler's attitude:

''That during the summer of 1933, this affiant purchased a stoker for his home, of a make other than an Iron Fire-

---

$15,000.—Boy 14, severe burns from exploding distillate, front of body, dwarfing growth, shortening life, rendering susceptible to disease. (*Lorden v. Stapp*, 21 Ariz. 646, 192 Pac. 246.)

$30,000.—Truck driver earning $52 per week, burned in throat and nasal passages, face, chest severely burned, flesh burned off right hand, permanently crippling it, both arms burned, hearing affected. (*Fredericks v. Atlantic Ref. Co.*, 282 Pa. 8, 127 Atl. 615, 38 A. L. R. 666.)

$18,725.51.—Railroad fireman, left leg crushed and shortened; entire right side scalded. (*Wilson v. Chicago Heights Terminal Transfer R. Co.*, 212 Ill. App. 271.)

$18,000.—Man, compound fracture of leg; no union despite protracted treatment. (*Zumwalt v. Chicago & A. R. Co.*, (Mo. Supp.) 266 S. W. 717.)

$18,000.—Railroad engineer, 32 oblique fracture of thigh bone; leg shortened and weakened. (*Gulf, C. & S. F. R. Co. v. Crow*, (Tex. Civ. App.) 220 S. W. 237.)

$15,000.—Woman; leg broken, permanently shortened, crippled for life, can't move without pain. (*Nelson v. Vicksburg, S. & P. R. Co.*, 141 La. 475, 75 So. 212.)

$15,000.—Railroad foreman, 47 years old, earning $150 per month, hip bone broken from pelvis, leg muscles injured, impaired 50 per cent. (*Frye v. Chicago, R. I. & P. R. Co.*, 157 Minn. 52, 195 N. W. 629.)

$15,000.—Railroad foreman, 40, leg broken and shortened, foot twisted, two ribs broken, fallen arch of right foot. (*Manning v. Chicago G. W. R. Co.*, 135 Minn. 229, 160 N. W. 787, 15 N. C. C. A. 591.)

$14,000.—Woman, leg broken, bone shattered, leg shortened 3 inches or more. (*Miller v. Harpster*, 273 Mo. 605, 201 S. W. 854.)

$13,500.—Laborer, 24, leg fractured and shortened. (*West Lumber Co. v. Powell*, (Tex. Civ. App.) 221 S. W. 339.)

$12,500.—Teamster, 28, earning $17 per week, leg fractured; leg shortened, possibility of amputation. (*San Antonio Brewing Assn. v. Gerlach*, (Tex. Civ. App.) 185 S. W. 316.)

man, and installed the same therein; and that in the fall of 1933, some several months after the purchase of this other stoker, this same Iron Fireman stoker salesman, whom this affiant now believes to have been said Claude Detweiler, again called upon him, and upon finding that this affiant had purchased another make of stoker other than the one

$12,000.—Female nurse, 32, leg fractured and shortened, wound in head. (*Schnurr v. Detriot United R. Co.*, 222 Mich. 591, 193 N. W. 772.)

$11,000.—Man, 77, earning $900 per year, compound fracture of right leg. (*Rathbone v. Detroit United R. Co.*, 203 Mich. 695, 169 N. W. 884.)

$10,000.—Boy, double fracture of leg. (*Grant v. Los Angeles Transfer Co.*, 45 Cal. App. 731, 188 Pac. 294.)

$10,000.—Married woman, 35, one leg broken, and permanently shortened, some permanent injury to other leg, ribs broken. (*McKenna v. Chicago City R. Co.*, 296 Ill. 314, 129 N. E. 814.)

$10,000.—Section-hand crushed between moving train, hip and leg crushed, bones of leg partially united, could move only by use of crutches. (*Concannon v. Davis*, 123 Me. 450, 123 Atl. 820.)

$10,000.—Negro dressmaker, earning $30 per week, both bones of one leg broken, leg shortened and impaired. (*Banks v. Morris & Co.*, 302 Mo. 254, 257 S. W. 482.)

$10,000.—50 per cent impairment of arm, and 25 per cent of leg. (*Hartman v. Fleming*, (Mo. Sup.) 264 S. W. 873.)

$10,000.—Woman, 36, fracture of femur, leg shortened 1.5 inches and functional use impaired 60 per cent. (*Peters v. United States Stores Corp.*, 101. N. J. L. 568, 129 Atl. 922.)

$10,000.—Girl, 6, leg crushed, in hospital 5 months, permanent deformity of leg. (*Rankin v. Ward Baking Co.*, 272 Pa. 108, 116 Atl. 58.)

$10,000.—Woman, compound spiral fracture of leg, shortened, reduced from $13,000. (*Samuels v. Hiawatha Holstein Dairy Co.*, 115 Wash. 343, 197 Pac. 24.)

$10,000.—Married woman, leg broken, resetting after poor union required. (*Pollock v. Wheeling Traction Co.*, 83 W. Va. 768, 99 S. E. 267.)

$10,000.—Boy, 14, skin and muscle torn from knee, terrible shock, etc., in hospital a year and still there at trial, leg shortened. (*Murray v. Cohen*, 4 N. J. Misc. 139, 132 Atl. 221.)

$9,800.—Mechanic, 39, thigh bone broken, confined to hospital more than 9 months, leg shortened, financial loss at time of trial over $2,000. (*Faulker v. Parish Mfg. Co.*, 210 Mich. 182, 166 N. W. 954.)

sold by him, flew into a *rage* and abused this affiant and left very angry at this affiant.''

''That, if this affiant talked to Claude Detweiler at all, his only conversations with him were the two conversations above mentioned with an Iron Fireman Stoker salesman; that this affiant did not on either of these occasions discuss with the said Stoker salesman, or with the said Claude Detweiler,

---

$9,000.—Man, left leg broken near knee, injury permanent, pain and suffering likely to continue indefinitely. (*Hotel Equipment Co. v. Liddell,* 32 Ga. App. 590, 124 S. E. 92.)

$9,000.—Woman, both bones of one leg broken and other leg injured. (*McConnell v. Chicago R. Co.,* 199 Ill. App. 490.)

$8,500.—Man, 56 years old, concussion of brain, severe burns, fracture of leg, sacroiliac joint twisted, spine and neck wrenched. (*Lauck v. Reis,* 310 Mo. 184, 274 S. W. 827.)

$8,500.—Young man, one leg fractured, shortened and impaired. (*Hines v. Messer,* (Tex. Civ. App.) 218 S. W. 611.)

$8,423.33.—Miner, 46 years old, earning $5 per day, spine injured, hips and right leg crushed, leg partially paralyzed. (*Whitehead Coal Min. Co. v. Schneider,* 75 Okl. 175, 183 Pac. 49.)

$8,000.—Man struck by auto, leg fractured and permanently shortened and stiffened. (*Kleckamp v. Lautenschlaeger,* 305 Mo. 528, 266 S. W. 470.)

$8,000.—Man, 34 years of age, leg fractured, imperfect union, permanent impairment. (*Baker v. Streater,* (Tex. Civ. App.) 221 S. W. 1039.)

$7,500.—Man, 60, compound comminuted fracture of leg, shortened two inches. (*Woods v. Kansas City Light & P. Co.,* (Mo. App.) 212 S. W. 899.)

$7,500.—Woman, leg fractured, shortened and twisted. (*Boyd v. Kansas City,* 291 Mo. 622, 237 S. W. 1001.)

$7,500.—Man, 31, both bones of right leg broken; leg shortened and deformed, earning capacity greatly impaired. (*Angle v. Fleming,* (Mo. App.) 259 S. W. 143.)

$7,000.—Man, 52, earning $27 per week, leg fractured and shortened, sore to use, earning capacity reduced $60 per month. (*Murray v. Yellow Cab Co.,* 180 Wis. 314, 192 N. W. 1021, 22 N. C. C. A. 746.)

$6,500.—Man, 35, leg fractured, shortened, and weakened. (*Danville Light, Power & Traction Co. v. Baldwin,* 186 Ky. 683, 217 S. W. 910.)

$6,300.—Stevedore, leg broken and permanently crooked. (*Lund v. Griffiths & S. Stevedoring Co.,* 108 Wash. 220, 183 Pac. 123.)

any matters or things at all concerning the gasoline tank explosion which resulted in this action.''

Also affidavits of Johnson that Detweiler's reputation for truth and veracity was bad. Appellant urges that such impeachment is out of place in civil actions but the authorities are to the contrary. (*Heath v. Scott*, 65 Cal. 548, 4 Pac. 557; *Lodge v. State*, 122 Ala. 97, 26 So. 210, 82 Am. St. 23, at p. 26; *Wise v. Wakefield*, 118 Cal. 107, 50 Pac. 310; 70 C. J. 822; I. C. A., sec. 16–1209; Rev. Stats. 1887,

$6,000.—Married woman, face, head cut and bruised, bones of leg broken below knee, body, arms and legs, bruised, in hospital 23 days, home 4 weeks, damages to wife and husband. (*Stanward v. Yellow Taxicab Co.*, 75 Cal. App. 96, 241 Pac. 902.)

$6,000.—Clergyman, 57, leg fractured near ankle and permanently shortened. (*Allen v. Johnson*, 144 Minn. 333, 175 N. W. 545.)

$6,000.—Child, 8 years old, fracture of femur, leg permanently impaired, reduced from $6,500. (*Koelling v. Union Fuel & Ice Co.*, (Mo. App.) 267 S. W. 34.)

$6,000.—Freight handler, 21, leg broken in two places and permanently stiffened, reduced from $15,000. (*Lampe v. American R. Exp. Co.*, (Mo. App.) 266 S. W. 1009.)

$6,000.—Compound fracture, wound healed slowly by granulation, leg shortened. (*Bernard v. Adams*, (N. J. Sup.) 116 Atl. 792.)

$5,778.—Longshoreman, 45, earning $22 per week, leg crushed, confined to home for over a year, disabled from doing anything hard. (*The No. 223*, 271 Fed. 531, affirmed 271 Fed. 532.)

$5,500.—Farmer, badly broken leg, crippled for life. (*Johnson v. Chicago & A. R. Co.*, 202 Ill. App. 369.)

$5,500.—Boy, 11 years old, one leg broken and shortened, sight of one eye impaired. (*Posch v. Chicago R. Co.*, 221 Ill. App. 241.)

$5,500.—Laborer, 24 years old, fracture of leg, leg permanently shortened, twisted and deformed. (*Haskell & B. Car Co. v. Trzop*, 190 Ind. 35, 128 N. E. 401.)

$5,458.—Woman, leg broken and permanently shortened, doubtful if bony union would ever form. (*Olsen v. Peerless Laundry*, 111 Wash. 660, 191 Pac. 756.)

$5,250.—Stevedore, 30 years old, earning $25 per week, leg broken and shortened, causing permanent limp. (*The Colon*, 241 Fed. 592, affirmed on other grounds in 161 C. C. A. 418, 249 Fed. 460.)

$5,000.—Teamster, compound fracture of both bones of left leg, permanently crippled. (*Wanamaker v. Chicago City R. Co.*, 202 Ill. App. 122.)

sec. 6082. See *Cameron v. Evans Securities Corp.*, 119 Cal. App. 164, 6 Pac. (2d) 272, at p. 276.) There was another affidavit that by reason of newspaper publicity there should be the inference that Detweiler knew of the case, and should have communicated his knowledge sooner than he did.

The granting of a new trial on the ground of newly discovered evidence is within the discretion of the trial court and in absence of abuse thereof should not be disturbed, and we do not think the record here shows such an abuse. (*Hall v. Jensen,* 14 Ida. 165, 93 Pac. 962; *State v. Fleming,* 17 Ida. 471, 505, 106 Pac. 305; *Seamons v. Davis,* 34 Ida. 393, 201 Pac. 716; *Caravelis v. Cacavas,* 38 Ida. 123, 127, 220 Pac. 110; *State v. Grant,* 26 Ida. 189, 140 Pac. 959.)

Judgment affirmed in the amount of $21,500. Costs to respondent.

Budge, J., concurs in conclusion, Morgan and Ailshie, JJ., concur, and Holden, J., dissents.

$5,000.—Tile setter, 56 years old, compound fracture of leg, unable to work for 11 months, and permanently incapacitated to follow former occupation. (*Paulsen v. McAvoy Brew Co.,* 220 Ill. App. 273.)

$5,000.—Miner, 40 years old, leg broken and shortened. (*Johnson v. Plymouth Gypsum Plaster Co.,* 174 Iowa, 498, 156 N. W. 721.)

$5,000.—Mail carrier, hit by auto, great suffering, shock to nervous system, injuries not permanent. (*Fenn v. Kansas Gas & E. Co.,* 118 Kan. 131, 234 Pac. 77.)

$5,000.—Army officer, skull fractured, nose broken, leg broken, fracture extending into knee joint. (*Ball v. Excelsior Heater & Supply Co.,* 153 Minn. 388, 190 N. W. 607.)

$5,000.—Boy, 15 years old, leg broken and crushed. (*Sparr v. American Tug Boat Co.,* 126 Wash. 59, 217 Pac. 53.)

$5,000.—Man, 42 years old, earning $8 per day, right hip dislocated, both bones of right leg fractured between knee and ankle, extremely severe shock, severely cut, bruised, and lacerated, could not work until 8 months after accident, deducting expenses and lost time, net amount for pain and suffering was less than $3,000. (*Steele v. Barash,* 134 Wash. 231, 235 Pac. 1.)

$5,000.—Workman, 60, one leg crushed, foot smashed, leg broken between knee and ankle, injured 7 months, heel sore, walking on crutches, injuries believed to be permanent, confined to be about 5 months, suffered excruciating pain. (*Jonesboro, L. C. & E. R. Co. v. Wright,* 170 Ark. 815, 281 S. W. 374.)